**Larry CASTLEBERRY, Plaintiff-Appellant,**

v.

**NRM CORPORATION, a foreign corporation, Defendant-Appellee.**

**No. 72-1262.**

United States Court of Appeals, Tenth Circuit.

Nov. 29, 1972.

Joe A. Moore, Memphis, Tenn. (Jack B. Sellers and Allen B. Mitchell, Sapulpa, Okl., on the brief), for plaintiff-appellant.

William S. Hall, Tulsa, Okl. (Green, Feldman & Hall, Tulsa, Okl., on the brief), for defendant-appellee.

Before PHILLIPS, HILL and HOLLOWAY, Circuit Judges.

PHILLIPS, Circuit Judge.

Castleberry brought this action [1] against NRM Corporation, hereinafter referred to as NRM, to recover damages for personal injuries.

From a judgment on a jury verdict for NRM, Castleberry has appealed.

Castleberry was employed by the Swan Rubber Company, hereinafter referred to as Swan, as the operator of a machine called an "extruder." The operator feeds rubber strippings from belts of various sizes into a hopper in the upper end of a cylinder, which engages a six-inch screw or auger. The cylinder remains stationary, but the screw turns and causes a forward movement of the strippings to be fed into the extruder. As the rubber strippings move forward, they are subjected to a masticating, flexing action, which reduces them to a soft plastic state, that is, a state capable of being molded, which is forced through a die cross-set. The cross-set and die were not provided by NRM, but by Swan. The braided portion of a hose moves into the extruder through a tube, and as it passes out of the tube it enters a larger tube into which the plasticized rubber is moving and the plasticized rubber forms a rubberized coating around the braided portion of the hose. Such coating is smooth and shiny.

The basic part of the extruder was designed and manufactured by NRM. When Swan ordered the machine, it furnished NRM a floor plan and specifications of where it was to be located with reference to other machines in the plant, and particularly where the control panel was to be located, by which the power that operated the extruder could be turned off and on, and its speed regulated. Other control panels for other machines were located on and carried by the same means on which the controls for the extruder power were located and carried.

The specifications and drawings provided that the control panel should be located about seven feet from the place where the employee stood when he fed the rubber strippings from belts into the hopper of the extruder and out of the reach of such employee, and it was so located.

Castleberry testified that he was first employed by Swan on October 8, 1968. On December 30, 1968, while he was operating the extruder there was a break in the material that he had been feeding into the machine, and he went to the feed box or hopper to refeed the machine so the material would go forward from the screw. He was required to do that expeditiously. Otherwise, the machine would "clog up." He refolded some belt strippings and started to refeed them into the machine. As they started to move forward in the cylinder by the action of the auger, the outside portion of the folded strippings wrapped about his left arm and his left hand was pulled into the hopper and into contact with the auger. He called out for someone to turn off the power. After some delay, it was turned off, and after about 15 minutes his hand was freed. He suffered severe injuries to his left hand, and a portion of the fingers and thumb of that hand had to be amputated.

It was the practice of Swan to form classes of new employees, furnish each of them with a manual, and give them a course of instruction with respect to the operation of the plant, including instructions with respect to safety.

The safety instructions included the operation of the extruder, and were given to a class of which Castleberry was a member. Among such instructions was an instruction to keep their hands out of the feed box or hopper of the extruder.

---

1. The action was commenced in an Oklahoma state court and duly removed to the federal court on the ground of diversity of citizenship.

At the trial, during the examination of Castleberry's second witness, the court asked counsel for Castleberry if he was trying the case on a negligence theory. Counsel replied, "Yes, sir, negligence in design and manufacture and negligence in the installation or the observing of the installation and inspection, and failing to make a proper recommendation and so forth, for safety to the operators of the machine." The court said, "But it's a negligence case?" Counsel for Castleberry replied, "That's my understanding of the Pre-Trial Order, it's strictly a negligence case."

After the case had been submitted and considered by the jury, the court was notified that the jury had reached a verdict. The jury was brought into the jury box and court was formally opened. The court inquired of the jury if it had reached a unanimous verdict. The foreman replied, "We have, Your Honor." The verdict was then passed to the clerk and the court instructed him to read it. Omitting the title of the case, the verdict read: "We, the jury, find for the defendant." It was dated November 3, 1971, and signed by Ralph Boatwright, as foreman. At the request of counsel for Castleberry, the jury was polled. On the poll, each of the first nine jurors answered that it was his verdict. The tenth juror, Mrs. Moon, shook her head negatively. The remaining two jurors replied that it was their verdict.

Counsel for Castleberry then moved for a mistrial. The court overruled the motion and directed the jury to return to the jury room for further deliberation, bearing in mind all of the instructions he had given them before. He reiterated also that only a unanimous verdict could be returned.

The jury again retired and in a short time reported that they had reached a verdict. In response to the court's inquiry as to whether there had been a unanimous verdict, the foreman replied in the affirmative. The verdict was then passed to the clerk, who read it. The verdict was in favor of the defendant and was dated and signed by the fore-

man. Counsel for Castleberry asked for a poll of the jury. The court said: "All right, surely. All right, ladies and gentlemen, once again, I will not—I will just ask, 'Is this your verdict? Do you agree to the verdict as read?' If it is your verdict, just please say 'yes'. If it is not your verdict, just please say 'no'." The court then asked the foreman, Mr. Boatwright, to answer the questions and he replied, "Yes." The court then asked each of the other 11 jurors, separately, to reply to the questions, and according to the reporter's transcript each of the other 11 jurors answered, "Yes." Counsel for Castleberry then said, "If Your Honor please, someone cleared their throat when Mrs. Moon—." The court interrupted him and said, "All right, Mrs. Moon, is this your verdict?" Juror Moon answered, "Yes." The court then thanked the jury and said, "The verdict of the jury being—being unanimous, the verdict of the jurors all jurors having assented thereto, it will be received and will be entered."

Counsel for Castleberry filed a motion for a new trial and attached thereto the affidavit of Juror Moon, in which she averred:

"When I was singled out in the courtroom and identified as the sole dissenting juror and then sent back to the jury room by the judge it was my belief that the judge intended for us to stay out until we agreed and that if I didn't agree with the rest of the jurors we would be kept in the jury room together indefinitely. I did not know that the jury had the right to disagree and report that disagreement to the court and be discharged.

"To keep from being kept together with the other jurors any longer, when the judge polled the jury the second time I said yes it was my verdict to get out of having to spend more time with the other jurors with whom I did not agree."

It will be observed that when the jury was polled with respect to the second verdict returned in open court and each of them was asked, "Is this your ver-

dict? Do you agree to the verdict as read?" both times the question was addressed to Mrs. Moon she answered, "Yes" and she averred in her affidavit that "when the judge polled the jury the second time I said yes it was my verdict."

It will be further observed that the reasons for her agreeing to the verdict, as stated in her affidavit, were wholly subjective and personal to her, and that she did not state nor even intimate that she had been induced to agree to the verdict by any statement or act of any other person, or by any extrinsic matter, thing, or influence whatsoever.

█ It is well settled law that when the verdict is read in open court and a juror states he disagrees with the verdict and does not assent thereto, or if on a poll of the jury a juror states he disagrees with the verdict and it is not his verdict, the court may either declare a mistrial and discharge the jury or direct the jury to return to the jury room and continue its deliberations.

The judge may direct the jury to follow the instructions theretofore given, and reiterate that their verdict must be unanimous. But he should not make any inquiries or suggestions nor give the jury any additional instructions.

In the case of Bruce v. Chestnut Farms-Chevy Chase Dairy, 75 U.S.App. D.C. 192, 126 F.2d 224, 225, the court stated the applicable law as follows:

"There can be no question of the right of a juror, when polled, to dissent from a verdict to which he has agreed in the jury room, and when this happens, the jury should either be discharged or returned to their room for further deliberation. It is both unwise and undesirable that the court should enter into an argument with the juror or require an explanation of his change of position. * * * *"

█ We hold that the court did not err in directing the jury to return to the jury room for further deliberation, and that it did not err in refusing defendants motion that it declare a mistrial.

In a memorandum opinion filed in the court below, in passing on the competency of Mrs. Moon's affidavit to impeach her verdict, the trial judge quoted from the Proposed Rules of Evidence for the United States Courts and Magistrates (Rule 606, approved by the Judicial Conference of the United States at its October 1971 meeting) as follows:

"(b) * * * Upon inquiry into the validity of a verdict * * * a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of any thing upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict * * * or concerning his mental process in connection therewith, except that a juror may testify on the question of whether or not extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received." (Italics ours.)

The rule followed in the federal courts and in the courts of many of the states, and the reasons therefor are stated in McDonald v. Pless, 238 U.S. 264, at 267–268, 35 S.Ct. 783, 784, 59 L.Ed. 1300, as follows:

" * * * For while by statute in a few jurisdictions, and by decisions in others, the affidavit of a juror may be received to prove the misconduct of himself and his fellows, the weight of authority is that a juror cannot impeach his own verdict. The rule is based upon controlling considerations of a public policy which in these cases chooses the lesser of two evils. When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of

a motion for a new trial, the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted to testify as to what had happened in the jury room.

\*     \*     \*     \*     \*     \*

" \*   \*   \* But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation, to the destruction of all frankness and freedom of discussion and conference." [2]

■ We conclude that the court did not err in refusing to receive and consider the affidavit or in overruling the motion for a new trial.

The instant case is clearly distinguishable from Fox v. United States, 5 Cir., 417 F.2d 84, relied on by Castleberry. In that case, when the jurors were polled, one juror, Larkin, gave no audible answer, but simply looked at the floor without raising his head. Hence, he did not assent to the verdict, and the court for that reason permitted the filing of an affidavit for him that he had not voted for the Government (the verdict was in its favor) in the jury room and did not answer in the affirmative when the jury was polled. There, the juror was permitted to impeach a verdict to which he had never publicly assented. In this case, Castleberry undertook to impeach the verdict by the affidavit of Mrs. Moon, when she had affirmatively assented to the verdict in open court in response to a direct question from the court, not once, but two times.

■ At the trial, Don H. Smith testified as a witness for NRM. On cross-examination by counsel for Castleberry, the following occurred:

"Q: Now then, Mr. Smith, you know of the National Safety Council, do you not?

"A: Yes, sir.

"Q: And you know of the Engineering and Reclaimed Manufacturing Committee of the Executive Committee, Rubber and Plastic Section of that Council, don't you?

"A: I do not know the group. We have safety engineers in the company.

"Q: Well, but you know within your company, within your company specialty, that the National Safety Council has a committee, an Executive Committee made up from representatives of the engineering and manufacturing —ah—ah—companies, rubber and plastics industry, that function with the National Safety Council, don't you?

"A: I believe there's such a group, but it's a very new group, I believe.

"Q: Well, I have, here, the Bulletin of that group dated—copyrighted in 1968, referred to as 'Data Sheet No. 610', entitled 'Extruders and Strainers in the Rubber and Plastic Industry'.

I ask you if you agree with this expression by that group of the National Safety Council in this Bulletin, as follows:—

"THE COURT: Excuse me.

2. See also United States v. 120,000 Acres of Land, D.C.N.D.Tex., 52 F.Supp. 212, 213.

"MR. HALL: If the Court please, this would be hearsay, improper Cross Examination.

"THE COURT: Objection sustained.

"Q: Well, you admit you are familiar with that group, aren't you?

"A: That there is a group, yes, sir.

"Q: And are there—is it considered usually an authoritative safety group, that is, the National Safety Council, authoritative and informed?

"A: It sounds very authoritative National—

"Q: Well, it's recognized within your industry as authoritative, is it not?

"A: I don't work with that group, sir, we have specialists that get into that.

"Q: Yes.

"A: And it sounds very authoritative to me.

"Q: All right, you recognize that as authoritative. Do you agree with this expression of September 16th—

"MR. HALL: I object, Your Honor.

"THE COURT: Excuse me, Mr. Sellers, you have already asked that question, and I've ruled that the objection is sustained. I've ruled, now, let's move on.

"MR. SELLERS: May I make an offer of proof, Your Honor?

"THE COURT: You may tender it to the Reporter . . . ."

To the last offer, the court sustained an objection interposed by counsel for NRM. On this appeal, counsel for Castleberry assigns such ruling as error.

We think the court, in the exercise of its discretion, properly stopped the cross-examination at that point. We think the testimony clearly revealed that while the witness knew of the group that put out the bulletin, he was not acquainted with it or the bulletin, and was not in a position to answer whether or not the bulletin was authoritative or whether he agreed with it.

Finally, counsel for Castleberry asserts that the court committed error in failing to instruct on the theory of recovery known as "strict liability in tort."

The court instructed the jury in part as follows:

"Now, the plaintiff (Castleberry) claims that a proximate cause of the accident and his injuries and damages was that NRM negligently designed the extruder machine by failing to equip it with safety devices or shields which were reasonable, feasible and economical, and which were available at the time of sale. Plaintiff further claims that NRM assumed responsibility for proper inspection and installation of the machine and, in doing so, negligently failed to install a cut-off switch within reach of the operator and negligently failed to warn Swan Rubber Company of the dangers involved in the operation of the machine so that Swan could take precautions to avoid injury to the operators of the machine, and that such negligence was a proximate cause of the accident.

\*    \*    \*    \*    \*    \*

"The defendant NRM denies that it negligently designed the machine and denies that it assumed responsibility for installation and inspection of the machine. The defendant further asserts as an affirmative defense that, even if. it was negligent, plaintiff was contributorily negligent in failing to follow instructions in using the machine and in placing his hand in the opening of the machine.

\*    \*    \*    \*    \*    \*

"Now, in this case Donald H. Smith was at all times material to this action, the agent and employee of the defendant NRM Corporation, and was acting in the scope of his employment. So, you're instructed that the defendant NRM Corporation is liable for the negligent acts or omissions, if any—if you find there were any, of Donald H. Smith.

"Now, while a manufacturer is not required to include the ultimate in safety in the design of his product, he owes a duty to exercise ordinary care in the design, engineering and fabrication of its product so that the same will be reasonably safe for those persons whom the manufacturer knows, or in the exercise of ordinary care should know would come in contact with it when the product is put in its intended use.

"Where a manufacturer fails to exercise ordinary care in the design, engineering and fabrication of its product so that the same will be reasonably safe to those persons whom the manufacturer knows or in the exercise of ordinary care should know would come in contact with it when the product is put to its intended use, the manufacturer is liable for injuries and damages proximately caused by the manufacturer's negligent act or omission."

At the close of the instructions, the court stated:

" * * * All right, let's see, gentlemen, objections or exceptions to the instructions of the Court, or failure to give any requested instructions? For the plaintiff, please."

Counsel for Castleberry then said:

"If Your Honor please, as stated to you and counsel—I mean, in conference in Chambers; the Court Reporter was absent; but during the last recess before the arguments—on behalf of plaintiff we felt that the instructions fail to fully embrace joint—the basic law of joint tort feasor as submitted to Your Honor in a requested instruction—I will locate that and date it and sign it, and ask you to endorse it and bind it and file it."

The court replied:

"Surely, just give it to Mrs. Wilkins, she'll—."

Counsel for Castleberry then said:

"All right, I think your Law Clerk may have those materials.

* * * * * *

"I—I have no other immediate thoughts, Your Honor, as to objection to the instructions, as given. I thought insofar as they covered the issues that they purported to cover, that they did so, and—."

The court asked:

"Those are your only objections and exceptions?"

Counsel for Castleberry replied: "Yes, sir."

 Here, counsel for Castleberry not only did not request an instruction on his theory of recovery known as "strict liability in tort," but affirmatively stated that he had no objection to the instructions as given. It follows that he may not now in this court raise the question of failure of the court, if failure there was, to instruct on the theory of recovery known as "strict liability in tort." See Fed.Rules Civ.Proc. rule 51, 28 U.S.C.A. Counsel for Castleberry did not on appeal assert or claim that the court erred by refusing to give his requested instruction on the liability of joint tort feasors.

Accordingly, the judgment is affirmed.