**Boris S. BROWZIN, Appellant,**

v.

**CATHOLIC UNIVERSITY OF AMERICA, a corporation.**

**No. 74–1474.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 1975.

Decided Dec. 8, 1975.

Matthew W. Finkin, New York City, of the bar of the Court of Appeals of New York, *pro hac vice*, by special leave of court, for American Association of University Professors as *amicus curiae*. Woodley B. Osborne, Washington, D. C., also entered an appearance for American Association of University Professors as *amicus curiae*.

Nicholas D. Ward, Washington, D. C., with whom Stephen A. Trimble and Richard W. Turner, Washington, D. C., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WRIGHT and McGOWAN, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

Recent years have brought financial troubles to scores of the nation's colleges and universities. Numerous faculty members have lost their teaching jobs as the colleges cut back in an effort to eliminate their deficits. We deal here with a challenge to one such layoff.

Dr. Boris Browzin, the plaintiff and appellant, was hired by Catholic University in September 1962 as a professor in the School of Engineering and Architecture. In 1962 and succeeding years he taught a full load of courses, concentrating primarily in the field of Structures and the field of Soil Mechanics. In late 1969 the School of Engineering and Architecture was faced with a severe budget reduction, and the administration, in conjunction with the faculty, began considering retrenchment and reorganiza-

tion of the school. The administration also took steps to cut back on the faculty, releasing some faculty members who were nontenured, and a few, including Browzin, who had achieved tenure. The Dean informed Browzin of this decision in a letter dated November 11, 1969. In it he stated that after a "detailed review of all of our current programs," he had identified certain areas in which the University had no great strength and could not hope to achieve strength under the new budgetary limitations. Two of those areas were Soil Mechanics and Hydrology, which were Browzin's particular responsibility. Consequently, those courses would no longer be offered after the 1969–70 academic year, and Browzin's appointment was to be terminated as of January 31, 1971—a date some 14 months after the letter giving notice of termination. The Dean emphasized that he was motivated by financial considerations alone in making the difficult termination decision. Browzin received a similar letter from the Provost of the University about a month later.[1]

Browzin sued, charging that this termination breached his contract with Catholic University. Before trial the parties stipulated that Dr. Browzin was a highly qualified professor in the field of civil engineering, that he was a tenured professor, and that Catholic University was faced with a *bona fide* financial exigency at the time the termination occurred. They also stipulated that the standards which were to govern the case were to be found in the 1968 Recommended Institutional Regulations on Academic Freedom and Tenure, propounded by the American Association of University Professors (AAUP). Tr. at 6. It was, in effect, a stipulation that the 1968 Regulations had been adopted as part of the contract between Browzin and the University, an adoption entirely consistent with the Statutes of the University and the University's previous responses to AAUP actions.

Of particular relevance is Regulation 4(c), which provides in pertinent part:

> Where termination of appointment is based upon financial exigency, or bona fide discontinuance of a program or department of instruction, Regulation 5 [dealing with dismissals for cause] will not apply * * *. In every case of financial exigency or discontinuance of a program or department of instruction, the faculty member concerned will be given notice as soon as possible, and never less than 12 months' notice, or in lieu thereof he will be given severance salary for 12 months. Before terminating an appointment because of the abandonment of a program or department of instruction, the institution will make every effort to place affected faculty members in other suitable positions. If an appointment is terminated before the end of the period of appointment, because of financial exigency, or because of the discontinuance of a program of instruction, the released faculty member's place will not be filled by a replacement within a period of two years, unless the released faculty member has been offered reappointment and a reasonable time within which to accept or decline it.

54 AAUP Bulletin 448, 449 (1968).

The case was tried to the court without a jury, and at the close of appellant's case the University moved for dismissal under Rule 41(b), Fed.R.Civ.P., contending that on the facts and the law presented he had shown no right to relief. The court granted the motion and this appeal ensued. Since the case turned on an interpretation of the AAUP's 1968 Regulations, the AAUP sought, and was granted, permission to appear before this court as *amicus curiae*. We conclude that the AAUP is

---

1. A few months after his termination Browzin found new employment, first with the District of Columbia government, then with an engineering firm in New York. His salary in his current job is considerably higher than his salary at Catholic University.

fundamentally correct in its interpretation of most of the crucial portions of the Regulations, but we affirm the District Court's disposition of the case.

## I

The major issue on this appeal centers upon the trial court's interpretation of the third sentence of Regulation 4(c): "Before terminating an appointment because of the abandonment of a program or department of instruction, the institution will make every effort to place affected faculty members in other suitable positions." Unlike the other three sentences of the Regulation, this sentence does not in terms speak to terminations based upon financial exigency; it speaks only of discontinuances of programs or departments of instruction. The District Court found this to be a crucial distinction, and held that the "suitable position" requirement does not apply to terminations resulting in any way from financial exigency. Since Browzin's termination did stem from the University's *bona fide* financial difficulties, the court ruled that the University had no obligation to seek another suitable position within the institution for him.

The *amicus* charges that this interpretation was erroneous. Drawing extensively on the history of the AAUP's efforts which culminated in the 1968 Regulations, it makes an impressive showing that the "suitable position" requirement was meant to apply even in terminations based strictly on financial exigency.

To understand this contention, Regulation 4(c) must be placed in context. It deals with terminations based on financial exigency or discontinuation of programs of instruction. But such terminations are not the central concern of the tenure system, nor of the 1968 Regulations. The real concern is with arbitrary or retaliatory dismissals based on an administrator's or a trustee's distaste for the content of a professor's teaching or research, or even for positions taken completely outside the campus setting. If a professor had no protection against such actions, he might well be deterred from pursuing his studies or his teaching in the paths that seem to him to be best. The tenure system, as embodied in the 1968 Regulations and in previous efforts by the AAUP and others, is designed to eliminate the chilling effect which the threat of discretionary dismissal casts over academic pursuits. It is designed to foster our society's interest in the unfettered progress of research and learning by protecting the profession's freedom of inquiry and instruction.[2] *See generally 1940 Statement of Principles on Academic Freedom and Tenure*, reprinted in 60 AAUP Bulletin 269, 270 (1974); *Developments in the Law—Academic Freedom*, 81 Harv.L.Rev. 1045, 1085 (1968). Under the Regulations a professor achieves "tenure," a permanent status within the university, after completing a probationary period, usually seven years. Thereafter, as provided in Regulation 5, he can only be dismissed for adequate cause "related, directly and substantially, to the fitness of the faculty member in his professional capacity as a teacher or researcher." In such cases he has extensive procedural rights, including the right to a detailed notice of the reasons why the administration seeks dismissal, the right to a hearing before a university body wherein those seeking dismissal

---

**2.** The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. * * * Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957) (plurality opinion of Chief Justice Warren). *See also id.* at 261–263 (Mr. Justice Frankfurter, concurring).

bear the burden of proof, and the right to representation by counsel.[3]

Regulation 5, however, does not cover all possible cases of termination. A university must have some flexibility to respond to drastic reductions in funds or to the need for a change in curriculum—and it is this sort of issue which faces us here. Because of the need for flexibility, Regulation 4(c) provides an exception to the "for cause" termination procedures required by Regulation 5 in the case of financial exigency or program discontinuance. In those situations the same elaborate procedural safeguards do not apply because they are not entirely suitable to the issues arising when the university changes its curriculum or reacts to reduced funding.[4]

But the obvious danger remains that "financial exigency" can become too easy an excuse for dismissing a teacher who is merely unpopular or controversial or misunderstood—a way for the university to rid itself of an unwanted teacher but without according him his important procedural rights.[5] The "suitable position" requirement would stand as a partial check against such abuses. An institution truly motivated only by financial considerations would not hesitate to place the tenured professor in another suitable position if one can be found, even if this means displacing a nontenured instructor.

The 1925 Conference Statement on Academic Freedom and Tenure, one of the important forerunners of the 1968 Regulations,[6] and one adopted, significantly, by both the AAUP and the Association of American Colleges (AAC), makes clear the intent, at least at that time, to apply the "suitable position" requirement to financial exigency terminations:

Termination of permanent or long-term appointments because of financial exigencies should be sought only as a last resort, after every effort has been made to meet the need in other ways and to find for the teacher other employment in the institution. Situations which make drastic retrenchment of this sort necessary should preclude expansions of the staff at other points at the same time, except in extraordinary circumstances.[7]

It is entirely proper to look to the 1925 Statement, and indeed to other materials cited by *amicus*,[8] in interpreting the con-

---

3. We wish to emphasize that this case does not involve the "for cause" termination provisions of Regulation 5. The sole question here is the University's compliance with Regulation 4(c), governing termination based on financial exigency or program discontinuance.

4. It still must be shown, of course, that the financial exigency or the program discontinuance was *bona fide*. In this case that showing was accomplished by stipulation: Catholic University was faced with a genuine financial exigency. Discontinuance of the courses in Soil Mechanics and Hydrology must be considered a *bona fide* result of the University's financial difficulties.

5. *See AAUP v. Bloomfield College*, 129 N.J.Super. 249, 322 A.2d 846 (1974) (college dismissed 13 tenured professors and placed all remaining instructors on one-year contracts, claiming financial exigency; the court found that the financial exigency was not *bona fide* and ordered reinstatement).

6. For the history of the 1925 Conference Statement and subsequent developments, *see* R.

Hofstadter & W. Metzger, The Development of Academic Freedom in the United States 480–490 (1955).

7. The 1925 Conference Statement also provides a strong indication that, as *amicus* argues, the search for a suitable position must extend to the entire institution. Although the most likely place to find other positions which will prove suitable is, of course, the department or school the professor formerly served, the university's obligation is not discharged unless it has considered other departments and schools as well.

8. Those materials include statements widely circulated and widely accepted by a large number of organizations involved in higher education (such as the 1925 Conference Statement and the 1940 Statement of Principles on Academic Freedom and Tenure), as well as guidelines and reports issued by the AAUP as a result of its investigations into incidents where principles of academic freedom or tenure have allegedly been violated. On the AAUP's important role as investigator and mediator, *see* Hofstadter & Metzger, *supra* note 6,

tract before us. As this court observed in *Greene v. Howard University*, 134 U.S.App.D.C. 81, 88, 412 F.2d 1128, 1135 (1969):

> Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is.
> * * * [9]

This does not mean, however, that all of the AAUP's proffered documents necessarily control the disposition of the case at hand. Determining the relevance of each requires a sensitive exploration of its impact on the academic community, assessing whether it represents accepted norms of conduct or has founded widely shared expectations.

In sum, we are left with conflicting indications as to the meaning of the third sentence of Regulation 4(c). The overarching purpose of the tenure system—protection of academic freedom—as well as the supporting materials invoked by *amicus*, do tend strongly to suggest that the "suitable position" requirement was meant to apply to terminations based on financial exigency. But it remains hard to square this suggestion with the language used in framing Regulation 4(c): care is taken in the first, second, and fourth sentences to specify financial exigency along with program discontinuance; the third sentence, however, mentions only abandon-

ment of a program or department in imposing the "other suitable position" requirement.

Fortunately, we are not required to resolve this apparent conflict between purpose and history on the one hand and the language of the Regulation on the other because there are other reasons which compel us to hold, regardless of the resolution of that conflict, that the "suitable position" requirement applied to the termination of Browzin's appointment. Financial exigency is in the case, but so is *abandonment of a program of instruction* —a matter expressly covered by the third sentence of Regulation 4(c). The District Court focused so intently on the former factor, financial exigency, that it apparently overlooked the presence of the latter. Catholic University, as the parties stipulated, was indeed faced with *bona fide* financial difficulties, but it chose to meet its problems by discontinuing its courses in Soil Mechanics and Hydrology. This discontinuance was, according to the University's own version of the events, the immediate reason why Browzin lost his job. There really is no dispute that there was an abandonment of Browzin's program of instruction. The Dean's letter makes the point explicitly; the University's counsel conceded as much at trial; and the District Court, in other portions of its findings, expressly so found. Tr. at 235–236, Findings at 2, 3.

■ The third sentence of Regulation 4(c) must be read to apply here. It

at 490–495; *Developments in the Law—Academic Freedom*, 81 Harv.L.Rev. 1045, 1105–1112 (1968). As to the former documents—the widely accepted statements—the propriety of our considering them in interpreting the contract here could hardly be questioned. They form a kind of legislative history for the 1968 Regulations, and they do represent widely shared norms within the academic community, having achieved acceptance by organizations which represent teachers as well as organizations which represent college administrators and governing boards. The propriety of considering the latter category—the AAUP's guidelines and reports—however, is more problematic. Although the AAUP's investigations are noted for their thoroughness and scrupulous care, the reports remain the

product of an organization composed of professors alone. It is not clear that the stipulation in this case was meant to embrace all subsequent AAUP interpretations and applications of the 1968 Regulations. Our manner of resolving the central issue, however, makes it unnecessary for us to delve more deeply into the applicability of the AAUP guidelines and reports.

9. *See also Perry v. Sindermann*, 408 U.S. 593, 602, 92 S.Ct. 2513, 33 L.Ed.2d 570 (1972) (referring to the possible existence of a "common law" of a particular university); Finkin, *Toward a Law of Academic Status*, 22 Buffalo L.Rev. 575 (1973).

makes no difference that financial exigency loomed in the background. The University did discontinue Browzin's program of instruction. It was therefore under an obligation to make every effort to find him another suitable position in the institution.

## II

The District Court's erroneous ruling that the third sentence was inapplicable does not necessitate reversal, however, for the court made an alternative finding. It ruled that even if the "suitable position" requirement applied, "the plaintiff's own evidence failed to prove a prima facie case that the University failed to make every effort to place him in another suitable position, or that such a suitable position existed * * *." Findings at 5–6. We are unable to conclude that this finding was clearly erroneous. See Rule 52(a), Fed. R.Civ.P. Although Browzin testified that the school had held no meetings with him before the notice of termination in an effort to find a suitable alternative position, this testimony does not by any means preclude the possibility that the University engaged in such efforts. Indeed, there is evidence in appellant's own presentation in the District Court that the school administration undertook a "detailed review" of all programs and positions before it sent Browzin his notice of termination. See, e. g., Exhibits 5–A, 5–B. Moreover, appellant chose to try the case on the theory that there was a suitable position available within the Department of Civil

Engineering.[10] Tr. at 14, 228–230. His counsel stressed again and again that Browzin was not limited to Soil Mechanics and Hydrology, the terminated courses, but that he was equipped to teach in the continuing area of Structural Design. However, Browzin's own witness indicated that the Structural Design courses could be taught by several members of the faculty and were in fact being given at the time by another tenured professor two years Browzin's senior, a point finally conceded by appellant's counsel. Tr. at 230. Teaching Structural Design might have been a suitable position for Browzin, but it was by no means available at the time of his termination.

Amicus AAUP suggests that this finding by the District Court should be reversed because the court erroneously placed the burden of proof on Browzin to demonstrate that the University had failed to make every effort to place him in another suitable position.[11] In the usual case the burden of course rests on the plaintiff as to all elements of his action for breach of contract. Nonetheless, there is some merit to the position of amicus. Ordinarily a litigant does not have the burden of establishing facts peculiarly within the knowledge of the opposing party.[12] The University here was plainly in a far better position to know what efforts were or were not undertaken to find for Browzin another post within the University.[13] This principle, however, cannot help appellant on this appeal. Appellant, as plaintiff below, assumed the burden of proof as to all

10. Where the plaintiff tries his case on one theory in the District Court, without any indication of other possible theories, he will not ordinarily be heard to press those other theories on appeal. Castleberry v. NRM Corp., 470 F.2d 1113, 1120 (10th Cir. 1972); Sisco v. McNutt, 209 F.2d 550, 553 (8th Cir. 1954); Cafasso v. Pennsylvania R. Co., 169 F.2d 451, 454 (3d Cir. 1948).

11. In its findings the District Court spoke only of Browzin's failure to make out a prima facie case on the "suitable position" issue—a ruling not necessarily inconsistent with assigning to the University the ultimate burden of proving that it made every effort to find Browzin another suitable position. We will assume for

purposes of this discussion, however, that the court did consider that Browzin bore the burden of proof on this issue.

12. The ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary. * * * United States v. New York, N. H. & H. R. Co., 355 U.S. 253, 256 n.5, 78 S.Ct. 212, 214, 2 L.Ed.2d 247 (1957).

13. Cf. AAUP v. Bloomfield College, supra note 5, 322 A.2d at 856 (burden placed on defendant college to prove existence of bona fide financial exigency).

issues at trial.[14] The District Court at several points indicated clearly that it understood the plaintiff to bear the burden of proof. Tr. at 60, 231, 237–242. Plaintiff's counsel had ample opportunity to object to that allocation of the burden; instead he acceded explicitly to the court's understanding. Tr. at 231. Neither the case law nor the contract makes crystal clear who is to bear the burden of proof on issues of this kind. If appellant expected the court to assign it to the University, he was under an obligation at least to apprise the court that there was some controversy over the matter.

█ If there was error in the court's handling of the burden of proof issue below, it was precisely the kind of error that could have been corrected if properly called to the judge's attention. After appellant rested his case, perhaps the District Court would have gone on to hear the University's witnesses. Very likely we would not then be faced with a suggestion that we remand for such a course now, nearly two years after the trial and six years after the events in question. Appellant's failure to object, although he had ample opportunity to do so, precludes his raising the burden of proof issue here. *See* Rule 46, Fed.R. Civ.P.[15]

14. *See Webster v. Wachovia Bank & Trust Co.*, 208 N.C. 759, 182 S.E. 333 (1935) (plaintiff, having assumed the burden of proof at trial, cannot be heard to claim on appeal that defendant should bear the burden); *Spurgeon v. Union National Bank*, 137 Kan. 98, 19 P.2d 459 (1933) (same).

15. Rule 46 makes unnecessary formal exceptions to rulings or orders of the court, but it clearly preserves the requirement that a party must make known to the court the action sought and the grounds therefor, provided only that the party has had an opportunity to object to the action of the court. "[T]he purpose of the rule requiring objections is to prevent reversals and consequent new trials because of errors the judge might well have corrected if the point had been brought to his attention." *Steinhauser v. Hertz Corp.*, 421 F.2d 1169, 1173 (2d Cir. 1970). *See Ries v. Lynskey*, 452 F.2d 172, 179 (7th Cir. 1971); *Baker v. Sherwood Construction Co.*, 409 F.2d

## III

█ The only other substantial issue on this appeal stems from the fourth sentence of Regulation 4(c). It provides that "the released faculty member's place will not be filled by a replacement within a period of two years," unless the displaced member has an opportunity to accept the post himself. There is no question but that Browzin was never offered the opportunity to return to his former place at Catholic University. Another professor did, however, join the Department approximately a year and a half after Browzin left, hired to teach Water Resources. The evidence showed that Browzin had competence in two of the branches of Water Resources, namely Hydrology and Hydraulics, which relate specifically to design of structures meant to control the flow or retention of water. He did not, however, have any particular background in the third branch, Planning. Tr. at 88. The University wished to emphasize the Planning branch of the subject, focusing more on the question whether a certain structure should be built rather than how to build structures already decided upon. The University reasoned that it could attract more students this way, since the growing interest in protection of the environment was making the Planning emphasis especially attractive.

194, 195 (10th Cir. 1969); 5A J. Moore, Federal Practice ¶ 46.02 at 1903 (2d ed. 1975).

Appellant tried the case in the District Court on the theory that he had the burden of proof. Counsel never made known to the court the action he now asserts it should have taken. He never suggested that the court should find that defendant bore the burden of proof on the "suitable position" issue. Once again we emphasize: a claimant ordinarily cannot expect to lose in the trial court on one theory but win on appeal under another. *Schenfeld v. Norton Co.*, 391 F.2d 420, 424 (10th Cir. 1968). We see no reason to depart from that sound rule here. If there was error on the point, it was not error so plain that it merits reversal even in the absence of objection. *Pardo v. Wilson Line of Washington, Inc.*, 134 U.S.App.D.C. 249, 254, 414 F.2d 1145, 1150 (1969); *Euresti v. Washington Terminal Co.*, 108 U.S.App.D.C. 81, 82, 280 F.2d 629, 630 (1960).

It also believed that it had a greater chance of obtaining grants for studies with such an emphasis than for studies of the more traditional type. And there was some indication that an outside committee reviewing the school's accreditation in mid-1971 had been the impetus for creating the new post. Tr. at 157–162. In sum, it was a program calling for someone with a background and interests different from Browzin's, whereas the interests and background of the other professor matched its requirements quite well. Clearly it was a program significantly different from what Browzin had been teaching during his years with Catholic University. The District Court found as a fact that the other professor had not been hired to fill Browzin's place. We are unable to conclude that that finding was clearly erroneous.[16]

IV

Two other points have been raised. *Amicus* asserts that Browzin's 14-month notice was insufficient, contending that the 12-month requirement announced in the Regulations should be considered to run from the conclusion of an academic year, rather than simply from the date of notification. Appellant, however, never breathed a hint of this contention in the District Court, and we do not consider it open to him on appeal.

Finally, both appellant and *amicus* urge that injunctive relief is appropriate in cases where a teacher has been improperly terminated. Since we affirm the District Court's holding that here there was no breach of contract, we intimate no views on this issue.

*Affirmed.*

16. There is no suggestion whatever in the record that the University delayed in creating the new position simply to avoid hiring Browzin—facts which would present an altogether different situation. The new position was created as the result of a genuine change in perceived needs and resources that arose for independent reasons after Browzin had left.