**REDWOOD CENTER LIMITED PARTNERSHIP and Dennis Leapley, Plaintiffs,**

v.

**The RIGGS NATIONAL BANK OF WASHINGTON, D.C., Defendant.**

**Civ. A. No. 90–656 SSH.**

United States District Court, District of Columbia.

May 8, 1990.

J. Jonathan Schraub, Lynn Perry Parker, Washington, D.C., for plaintiffs.

Paul Martin Wolff, Gerson A. Sweifach, Nancy F. Preiss, Washington, D.C., for defendant.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on plaintiffs' motion for a two-part preliminary injunction (1) requiring defendant to fund the construction of the Redwood Center, and (2) prohibiting Riggs from commencing foreclosure proceedings against the Redwood Center Limited Partnership's ("Partnership") interest in the Redwood Center, or legal action against plaintiff Leapley or his wife under certain guaranty agreements. For the reasons set forth below, plaintiff's motion must be denied.

### Background

The plaintiff Partnership is a limited partnership, formed on March 30, 1988, for the purpose of acquiring and renovating Redwood Center, real property located in Baltimore, Maryland. Plaintiff Leapley is the sole general partner of the Partnership, as well as sole owner of The Leapley Company, a real estate general contractor, and the Lecoin Group, Inc., which acquires, renovates, and leases commercial real estate.

Prior to the formation of the Partnership, the Lecoin Group, with Brady Armstrong as its President, obtained financing from defendant, The Riggs National Bank of Washington, D.C. ("Riggs"), for two projects. First, in April 1984, Riggs extended a $450,000 construction loan to Lecoin for the development of a project known as 1724 Kalorama Road, Washington, D.C. Then, in November 1985, Riggs provided $2.4 million in acquisition and construction financing for a commercial office building in Baltimore, Maryland, known as Federal Hill Place. Both lending transactions were negotiated by Armstrong and James Trimble, a Senior Vice President and real estate lending officer at Riggs.

Because Armstrong and Lecoin had developed a good working relationship with Trimble at Riggs, Armstrong contacted Trimble in 1987, and again in 1988, when he decided that Lecoin should undertake to acquire and renovate the Redwood Center.[1] Trimble expressed an interest in the project on behalf of Riggs. On April 6, 1988, the Partnership signed a contract with Seaman's for the purchase of Redwood Center. On April 12, 1988, Armstrong sent Trimble a letter, reminding him of the Redwood Center project and providing him with information about plans for its acquisition and construction. Again, Trimble expressed a positive interest in the project. Armstrong sent another informational letter to Trimble on May 13, 1988, in which he

---

1. Leapley and Armstrong first became interested in purchasing and developing the Redwood Center in 1987. However, before they could even begin to proceed, the owner, The Seaman's Bank for Savings, F.S.B. ("Seaman's"), extended an option to another buyer. In 1988, the other buyer/developer defaulted, and Armstrong began to negotiate the acquisition.

noted that three architectural concepts for the development were being evaluated. In July 1988, the Architectural Review Board of Charles Center Inner Harbor Management determined that the value of the project could be increased if plaintiffs purchased the alley separating the two buildings comprising Redwood Center and connected them at the street level. Both Trimble and Armstrong agreed, and thus Lecoin began working toward this development concept.

On August 10, 1988, Lecoin applied for an acquisition/construction loan in the amount of $13.6 million, in preparation for its August 26, 1988, date for settlement on the purchase of the property. However, that figure was based on appraisals for the original development scheme, which involved bridging the alley, rather than closing it entirely. Furthermore, despite providing figures for the original concept, the letter continued to refer to changing the development concept to the one involving closing the alley, and it was apparent that the latter was the one plaintiffs preferred. When it became obvious that the alley closing could not be negotiated before the August 26 settlement date, Leapley requested another extension from Seaman's.[2] Seaman's, anxious to close the deal on the property, inquired as to Riggs' position on the financing. On August 16, 1988, Trimble sent a letter to Edward Polito, a senior real estate officer at Seaman's, in which he reassured him that Riggs was "working with [Leapley and Armstrong] to finance this project." Apparently unconvinced and

needing a firmer commitment from Riggs, Seaman's denied the extension.

As long as the alley closing was uncertain, Trimble believed that he was unable to submit a construction loan proposal to the bank's Loan Committee for approval. However, he expected that he would be able to submit the proposal and recommend loan approval within 60 to 90 days, the time that Armstrong expected it would take for city approval of the alley closing. In order to avoid collapse of the entire project, Trimble did submit the acquisition loan application to the Loan Committee with his recommendation for approval. Reassured, Seaman's agreed to extend the settlement date to November 28, 1988. On October 3, 1988, Trimble informed Armstrong that the Loan Committee had approved the acquisition loan of $3.8 million, and on November 28, 1988, the Partnership purchased Redwood Center.[3]

It was not until July 7, 1989, several months beyond what the parties had expected, that Armstrong sent Trimble the Partnership's application for the construction loan, informing him that the alley had been closed and construction could begin.[4] Trimble held a meeting on July 11, 1989, at which time he requested additional information about the project and about Leapley himself. On July 27, 1989, Trimble informed Leapley that Riggs would not make the construction loan, and that there was no point in taking the application to the Loan Committee because it had no chance of success.[5] Subsequent appeals to Riggs

---

**2.** Lecoin had already requested and been granted a few short extensions on the settlement date. This extension was requested because both Riggs and Leapley were hesitant to negotiate construction financing while the alley closing remained an uncertainty. Lecoin had pointed out that construction costs for this enhanced development concept would be greater than for the original proposal.

**3.** Leapley and his wife executed a Guarantee Agreement promising to personally guarantee payment of the acquisition loan.

**4.** While seeking city approval on the alley closing, the Partnership had begun preparations for construction. Trimble, as well as his supervisor and another loan officer, did visit the Redwood Center site on May 2, 1989. Trimble claims that

he did at that time inform Armstrong and Leapley that because of deteriorating market conditions, there was a "cool breeze blowing" on commercial real estate loans at Riggs. On July 6, 1989, the Mayor of Baltimore signed legislation authorizing the closing and sale of the alley.

**5.** Trimble did offer to recommend approval to the Loan Committee if plaintiffs could satisfy two conditions: first, obtain the $4 million in equity needed to finance the project, and second, prelease a significant portion of the building. Apparently, during this period Riggs had substantially tightened its standards for real estate loans due to unfavorable changes in the market. Leapley informed Trimble that he could not satisfy these conditions.

were unsuccessful, and the Partnership diligently sought alternative financing, also unsuccessfully. The acquisition loan fell due on November 28, 1989, but the Partnership was unable to repay it, having originally expected to repay it in the normal course from permanent financing placed on the property once construction was completed. The Partnership now fears foreclosure.

Plaintiffs filed this lawsuit on March 22, 1990, and the Court granted an expedited discovery schedule. A hearing on the motion for preliminary injunction was held on April 27, 1990.

### Discussion

In ruling on a motion for a preliminary injunction, the Court must consider four factors: (1) whether plaintiffs have made a strong showing that they are likely to prevail on the merits, (2) whether plaintiffs have shown that, absent such relief, irreparable injury will result, (3) whether issuance of the injunction will harm the interests of the other parties, and (4) whether the public interest supports the grant of relief. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 842 (D.C.Cir.1977); *Virginia Petroleum Jobbers Association v. FTC*, 259 F.2d 921, 925 (D.C.Cir.1958). Furthermore, "[t]he power to issue a preliminary injunction, especially a mandatory one, should be 'sparingly exercised.'" *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C.Cir.1969); *see also Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir.1980).

■■■ Plaintiffs have not made a strong showing that they had an enforceable loan agreement with defendant, and thus that they are likely to prevail on the merits. For an enforceable contract to exist in the District of Columbia, there must be both agreement as to all material terms and the intention of the parties to be bound. *Georgetown Entertainment Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985) (citing *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 546–47 (D.C.1981)). Furthermore, in a breach of contract action, the burden is on the plaintiff to prove all elements of the action. *Browzin v. Catholic University of America*, 527 F.2d 843, 849 (D.C.Cir.1975); *Banze v. American International Exports, Inc.*, 454 A.2d 816, 817 (D.C.1983).

Plaintiffs argue that at all times during negotiations on the Redwood Center project, the parties understood that plaintiffs were seeking one loan for the acquisition and construction of Redwood Center. They contend that the loan was bifurcated, at Trimble's suggestion, only to accommodate the seller's desired settlement date, but that there was no question in the minds of the parties that the construction funding, merely the second part of a two-part loan, would follow once the plaintiffs secured the alley closing. They claim that they surely would not have obligated themselves to Riggs on the purchase price and the guaranty had they not been assured that Riggs intended to fund the construction loan.[6]

The facts now in the record do not appear to bear out plaintiffs' theory, but rather reveal that the parties engaged in a course of negotiations in contemplation of ultimately reaching an acceptable loan agreement. There is no doubt that defendant, through Trimble, expressed an interest in the project. Unfortunately for plaintiffs, however, interest does not equate with a contractual obligation. Rather, the parties must have the intent to be bound by an agreement, and, in this case, the Court does not believe that plaintiffs will be able to meet their burden of proving the requisite intent.

In his August 16, 1988, letter written to Seaman's, Trimble stated that he was working with Leapley and Armstrong to finance the Redwood Center project, and

6. In their pleadings, plaintiffs cite several cases which they argue support the granting of their requested two-part injunction. However, in not one of the cases cited did a court grant a mandatory injunction ordering specific performance before resolving the case on the merits. Furthermore, most of the cases are easily distinguishable, in that their facts differ markedly from the facts of this case.

that once the alley closing was approved, which, as he understood it, would be within 60 to 90 days, he would be in a position to recommend financing to the Loan Committee at Riggs. It is significant that this letter represents a marked change from the draft letter that Armstrong had written hoping that Trimble would sign. The draft letter had stated that "Riggs Bank will finance this project," and set forth several details about specific loan terms, none of which Trimble included in the letter he ultimately sent to Seaman's.[7]

Furthermore, plaintiffs' July 7, 1989, application for construction financing requested an "additional loan," not the second part of a two-part loan.[8] It also recognized that the application must ultimately proceed to the Loan Committee for approval.[9] Yet, neither the tone nor the substance of the letter of application suggests that plaintiffs were simply requesting a loan that defendant had previously obligated itself to provide.[10]

Plaintiffs have also failed to make a strong showing that the parties agreed on all material terms for a construction loan, even recognizing that real estate development loans are evolving rather than static in nature. In August 1988, when plaintiffs first applied for a loan for this project, they supplied Riggs with figures from an appraisal based on the bridging concept, even while they were fast moving toward the alley-closing concept. Trimble made clear at that time that plaintiffs were not ready to apply for a construction loan, since the development concept, and thus the amount of the necessary funding, had not yet been finalized. It appears that the defendant did not know the exact amount of the expected loan request until it received the July 7, 1989, letter of application. Furthermore, although plaintiffs several times during the negotiations process referred to basing the loan terms on the terms of a previous loan for Federal Hill Place, they have not made a strong showing that there was a "meeting of the minds" as to the specific terms for this significantly larger construction loan, notwithstanding that there were preliminary negotiations.

Plaintiffs' situation is very unfortunate, and there is little doubt that they will sustain financial, and perhaps reputational, harm. The Court believes that plaintiffs had developed a good working relationship with Trimble and the defendant, and that they probably would have succeeded in reaching a loan agreement had the commercial real estate market not taken a downward turn. After all, Trimble did offer his enthusiastic support for this project. However, the injunctive relief plaintiffs seek would be harmful not only to defendant's interest, but also to the public interest, and a balancing of the equities tilts in

---

7. It is worth noting that even Seaman's understood that Riggs did not then intend to be bound, since Seaman's refused to extend the settlement date, even after receiving the letter, absent a more solid commitment from Riggs.

8. Also, on September 26, 1988, in a letter to Trimble to confirm the acquisition loan, Armstrong wrote that "[t]his revised structure calls for an acquisition loan only...."

9. Plaintiffs argue that, in their experience with Riggs, the Loan Committee was basically a rubber stamp for the loans that Trimble negotiated, and therefore that Trimble had both implied and apparent authority to obligate Riggs. They show that, in 1988, Trimble submitted 46 loan applications to the Committee, and that not one of them was rejected. Yet, plaintiffs do not, and indeed cannot, argue that they did not know that the Loan Committee must approve all loans. Plaintiffs are well aware that, in approving the Redwood Center acquisition loan, the Committee changed the term of the loan from Trimble's recommendation of two years to one year. Furthermore, the Court finds nothing in the record at this time to indicate that Trimble himself ever downplayed the role of the Committee. Finally, it is not surprising that an experienced loan officer such as Trimble would have such a record of successful approvals from the Loan Committee, since it is his job to work with potential borrowers to prepare applications with terms the Committee will accept. However, the fact that he is good at his job does not render the Loan Committee approval a rubber stamp.

10. The fact that defendant was aware that plaintiffs were engaged in a two-part project—acquisition and construction—at the time it agreed to provide the acquisition funding does not mean that it intended to obligate itself subsequently to provide the construction funding.

defendant's favor.[11]

If the Court were to grant the mandatory injunction, defendant would be compelled to provide in excess of $12 million in funding for construction of the Redwood Center, even absent a strong showing by the plaintiff that the parties had reached an enforceable loan agreement. Furthermore, should defendant subsequently succeed on the merits, it inevitably would be left with a security interest in the Redwood Center, since for all practical purposes plaintiffs are unable to post a bond to ensure defendant's return to the status quo.[12] Obviously, defendant ultimately concluded that it did not want an interest in the Redwood Center, and thus the security interest is not a reasonable substitute for the money itself.

 Moreover, the Court agrees with defendant that the Court must refrain from becoming a "Super Loan Officer." Riggs is clearly in the better position to negotiate and approve the terms of a loan with a borrower, and this Court would not serve the defendant's interest or the public interest by ordering a bank to provide a loan on terms the Court provides, absent a clear agreement to the terms by the parties themselves. Furthermore, ordering the loan under these circumstances would have a chilling effect on loan officers' willingness to show preliminary interest in ventures and to work with potential borrowers in the hope of ultimately gaining loan approval from a bank. Finally, banks increasingly are being sued by their shareholders for having made "bad" loans. This Court should not compound the problem by forcing a bank to make a loan in the absence of a strong showing that it obligated

itself to do so under an enforceable loan agreement.[13]

SO ORDERED.

---

**11.** It is true that the hardship defendant would suffer stems more from the grant of the mandatory injunction than from being enjoined from commencing foreclosure proceedings. However, because the Court finds that plaintiffs have not made a strong showing that they are likely to succeed on the merits, both parts of plaintiffs' motion must be denied.

**12.** Plaintiffs have asked that the Court grant the preliminary injunction without requiring plain-

tiffs to post security for payment of costs or damages as may be incurred by defendant should defendant succeed on the merits, as required by Federal Rule of Civil Procedure 65(c).

**13.** The Court is, of course, not suggesting that a bank is entitled to renege on a loan it later concludes is "bad," once it has, in fact, entered into an enforceable loan agreement.