EDWIN G. SCHEUER, JR., PH.D., APPELLANT, V.
CREIGHTON UNIVERSITY, A NEBRASKA
NONPROFIT CORPORATION, APPELLEE.

260 N. W. 2d 595

Filed December 21, 1977.   No. 41232.

Riedmann & Welsh, William J. Riedmann, and E. Terry Sibbernsen, for appellant.

Lyle E. Strom and Robert L. Matthews, Jr., of Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, for appellee.

David M. Rabban and Matthew W. Finkin, for amicus curiae.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, and WHITE, JJ., and HASTINGS, District Judge.

SPENCER, J.

This is an action for reinstatement of employment. Edwin G. Scheuer, Jr., was terminated as an assistant professor at the School of Pharmacy of Creighton University, on the ground of financial exigency in that school. The trial court dismissed his petition. Two questions are presented: (1) Should the contract be construed to require a showing of financial exigency on the part of the University as a whole or only as to the School of Pharmacy; and (2) whether a financial exigency existed within the meaning of that term as it is used in the contract between the parties. We affirm.

Edwin G. Scheuer, Jr., was a tenured assistant professor at the School of Pharmacy of Creighton University, Omaha, Nebraska. Creighton University is a private institution of higher education with its principal place of business in Omaha, Douglas County, Nebraska. Scheuer had been granted the status of a tenured member of the faculty of Creighton University in 1971.

The School of Pharmacy is one of four schools making up the Health Sciences Division of the University, the others being Medicine, Dentistry, and Nursing. Each of the four schools has its own Dean, with the Vice President for the Health Services being responsible for the entire Health Sciences Division.

Creighton University operates on a June 1 to May 31 fiscal year. The budget for each school year is prepared in the fall of the preceding year. The School of Pharmacy has three sources of income: Tuition and fees; income generated from clinical services; and federal funds. A large part of the federal funds received were "capitation funds," which represent a certain amount of federal funds given to health science schools for each student educated. These funds were contingent upon the school agreeing to a specified enrollment increase. Additionally,

in the School of Pharmacy, the funds were further conditioned on the school expanding its clinical pharmacy program.

In the fiscal year 1975-1976, the School of Pharmacy received approximately $160,000 in federal "capitation funds." For this same fiscal year, the School of Pharmacy's entire budget was between $600,000 and $700,000. In spite of federal aid, the School of Pharmacy had operated at a deficit since 1971. These deficits and the federal funding have been as follows:

| Fiscal Year | Deficit | Federal Funding |
|---|---|---|
| 1971-72 | $11,407 | $ 76,580 |
| 1972-73 | 68,311 | 70,199 |
| 1973-74 | 40,353 | 83,615 |
| 1974-75 | 56,656 | 142,733 |
| 1975-76 | 56,000 | 159,782 |

In June of 1975, the Vice President for the Health Sciences Division learned the Division was facing a $900,000 deficit for the fiscal year 1975-1976, which had just begun. The School of Pharmacy was responsible for approximately $50,000 of that deficit. Later that same summer, he learned the entire Health Sciences Division was facing a reduction of funds for the year 1976-1977, in the amount of $2,000,-000, and this sum was on top of the already expected loss of $900,000. Of the $2,000,000 loss in funds for the Division, approximately $160,000 of that loss was attributable to the School of Pharmacy as a result of the loss of "capitation funds."

Adding to the problems of the School of Pharmacy was the fact that it was moving into a new building in the spring of 1976. This move created $100,000 in additional expenses for the School of Pharmacy. There was no possibility of postponing the move since the expenses had already been accrued in the building. Also, the School of Pharmacy had made a commitment to the federal government to move into the building or else refund certain government

grants. Additionally, the School of Pharmacy's accreditation depended upon its moving into the new facility.

The record indicates steps were taken to cut costs without impairing the essential goal of maintaining the integrity of the program in the School of Pharmacy. Cuts were made first in the area of non-salary costs, such as equipment, traveling, and office supplies. A freeze was placed on faculty salaries. Steps were taken to terminate certain non-faculty positions. These steps were not sufficient, so it then became necessary to reduce the faculty. After a review of the various positions and their relation to the program, it was found necessary to terminate four faculty members. One of them was the plaintiff. Plaintiff was chosen because the only course he taught was medicinal chemistry which could also be taught by a tenured faculty member who had seniority over him and who also could teach biochemistry which plaintiff had stated he could not teach.

On November 25, 1975, plaintiff was notified by letter from the President of the University that his appointment as a member of the faculty of the School of Pharmacy would terminate, effective December 1, 1976. The termination notice stated in part: "Because of financial exigencies which have arisen by reason of cut backs in federal support of basic Health Sciences educational programs, the School of Pharmacy has been required to make cuts in its program. * * * After consultation with the Vice President for Health Sciences and with the Dean of Pharmacy, it has been determined that your position is one which is being abolished."

Both parties agree that termination procedures are governed by the Creighton University faculty handbook. The handbook provides: "The right of tenure may not be revoked except for cause. In general we understand by 'cause', professional in-

competence; medical-physical incapacity; substantial and manifest neglect of duty; grave misconduct (including inciting the immediate impairment of the institution's functions, or personally and physically causing such impairment); personal conduct substantially impairing the individual's performance of his appropriate functions within the University community; *and financial exigency on the part of the institution.* The burden of showing cause and of substantiating such a showing with a preponderance of the evidence is upon the institution. * * *

*"Where termination of appointment is based upon financial exigency, which may be considered to include bona fide discontinuance of a program or department of instruction or the reduction in size thereof,* faculty members affected may have the issued (sic) reviewed by the Academic Senate or Academic Council, or by the Faculty Grievance Committee, with ultimate review of controverted issues by the Board of Directors. In cases of financial exigency, including discontinuance or reduction of a program or department of instruction, the faculty member concerned is to be given notice as soon as possible but never less than 12 months before termination; or, in lieu thereof, he may be given severance salary for 12 months.

"Before terminating an appointment because of discontinuance or reduction of a program or department of instruction, the university will make every effort to place affected faculty in other suitable positions. If an appointment is terminated before the end of the period or term of appointment because of financial exigency, the released faculty will not be replaced for two years thereafter unless the released faculty has been offered reappointment and a reasonable period during which to accept or decline this reappointment." (Emphasis supplied.) The emphasized portions of the quotations above are the portions which are pertinent to the discussion herein.

It is undisputed that Creighton University as a whole was not in a real state of financial exigency. However, as set out hereafter, the testimony of its Treasurer might suggest otherwise. The trial judge found plaintiff's appointment could be terminated upon a showing of financial exigency in the School of Pharmacy. We approach the case on that premise. The District Court found the language contained in the faculty handbook "clearly defines 'financial exigency' as possibly being 'bona fide discontinuance of a program or department of instruction or the reduction in size thereof,' " and concluded that " 'financial exigency' should be construed as requiring a determination with a particular college, rather than requiring consideration of the financial condition of the University as a whole." The District Court made no reference to the language "and financial exigency on the part of the institution."

Another section of the faculty handbook relied upon by the District Court in reaching its determination was a provision concerning dual appointments. The handbook states: "A faculty member may hold appointments in more than one department and/or school or college. Dual appointments may be set up when the chairman of the appropriate departments and the dean or deans, as the case may be, expressly request such an arrangement for the reason that it will help them discharge their educational and service responsibilities. One department or college or school should always be designated primary, within which the faculty member concerned will accrue time toward academic tenure. Tenure should obtain in only one department or school or college and shall refer only to the primary appointment. Whereas financial support for the salary of the faculty member may be derived from both departments, with the consent of both chairman, it is understood that the chairman of the secondary department may withdraw support at the end of any de-

fined budget period, and that the obligation for full-time support will then revert to the primary department." The court found "expressed in this provision of the contract a clear understanding that various departments — individually — shall be responsible for the salary of its faculty."

Provisions of the faculty handbook not cited by the District Court but which would also appear to be relevant are the following: "The chief administrator in a school or college carries the title of Dean. A dean exercises general executive responsibility for his school or college under the appropriate vice president, concerning himself with the broad educational policies, programs and procedures of his school or college. * * *

"A dean is empowered to employ, evaluate, reappoint or terminate faculty upon recommendation by the appropriate department chairman after the chairman has consulted with the full-time faculty of his department. He is also empowered to recommend faculty for promotion in rank and for tenure — again, after consultation with the appropriate department chairman. (The powers enumerated in this paragraph are to be exercised in conformity with policies and procedures established by the university's Committee on Rank and Tenure and in conformity with the procedures detailed in this Handbook for nonreappointment, termination and dismissal.) * * *

"A school or college may be organized by departments. A department is an administrative unit consisting of faculty members engaged in educational pursuits under the direction of a chairman. * * *

"Individuals become members of a school or college, and at the same time the entire university faculty, on the basis of a formal contract which is normally detailed in writing and fully executed by appropriate university officers. Such contracts are considered bilateral; that is, they are interpreted as

containing explicit or implicit promises on the part of the faculty member to perform his assigned duties satisfactorily in consideration of the university's promises to afford faculty status, with all its benefits, and a stated salary, etc. * * *

"Contracts between the university and tenured faculty are considered permanent or continuing in the sense that they are automatically renewed until the faculty member's retirement unless (1) the faculty member gives timely notice, as it is described in this Handbook, of termination; or (2) the university gives timely notice of intent to terminate for cause. Procedures governing termination or dismissal for cause are also set forth in detail in this Handbook."

The faculty handbook further provides: "Creighton University recognizes that its faculty is entitled to enjoy and exercise, without penalty or fear of reprisal, all the rights of American citizens, as well as the rights of academic freedom as they are understood in Academe.

"In evidence of this recognition, the university endorses the *1940 Statement of Principles on Academic Freedom and Tenure* adopted and promulgated by the Association of American Colleges and Universities and by the American Association of University Professors. The university likewise endorses the *1958 Statement on Procedural Standards in Faculty Dismissal Proceedings* adopted and promulgated by these associations."

The 1940 statement provides: "After the expiration of a probationary period, teachers or investigators should have permanent or continuous tenure, and their service should be terminated only for adequate cause, except in the case of retirement for age, or under extraordinary circumstances because of financial exigencies. * * * Termination of a continuous appointment because of financial exigency

should be demonstrably bona fide." "Financial exigency" is not defined in the statement.

The termination procedures contained in the faculty handbook closely parallel those proposed by the American Association of University Professors in its *1968 Recommended Institutional Regulations on Academic Freedom and Tenure.* The brief of amicus curiae suggests that the American Association of University Professors, hereinafter called AAUP, has since adopted its *1976 Recommended Institutional Regulations on Academic Freedom and Tenure.* This for the first time defines "financial exigency" as "an imminent financial crisis which threatens the survivial of the institution as a whole and which cannot be alleviated by less drastic means."

Plaintiff and amicus curiae, the American Association of University Professors, cite certain cases suggesting upon proper analysis they tend to support their interpretation that financial exigency was intended to extend to the University as a whole. We disagree. In none of these cases do we find even a suggestion that the issue should be so determined. In fact, a close analysis of some of them would indicate they may actually support the position of the defendant, Creighton University.

American Assn. of University Professors v. Bloomfield College, 129 N. J. Super. 249, 322 A. 2d 846 (1974), affirmed 136 N.J. Super. 442, 346 A. 2d 615 (1975), concerned a small college with an enrollment of less than 1,000 students. The college had been operating at a deficit for several years. The trial court found because it had assets in the form of real property which could be sold to alleviate the liquidity problem, there was no financial exigency. The appellate court disagreed and specifically found the evidence sufficient to prove the existence of the criterion of financial exigency required by the contract. We assume this case was included to imply

that Creighton University was not faced with a financial exigency because it had assets otherwise which could have covered the deficits in the School of Pharmacy.

So far as we have been able to ascertain, there is not a single case in any jurisdiction which sustains the plaintiff's position. The only case on point cited by the plaintiff, Browzin v. Catholic, University of America, 527 F. 2d 843 (D. C., 1975), would appear to support the defendant's contention rather than that of the plaintiff.

In Browzin, the question of whether the financial exigency must be institution-wide did not arise because the parties stipulated the University was faced with a bona fide financial exigency at the time the plaintiff's contract was terminated. Plaintiff was a tenured professor in the School of Engineering and Architecture. In 1969, that department was faced with a severe budget reduction and steps were taken to identify areas which needed to be cut back. The administration decided not to offer courses in soil mechanics and hydrology which were taught by the plaintiff. The Dean of the School of Engineering and Architecture informed plaintiff of this decision and informed him his appointment would be terminated as of January 31, 1971, a date some 14 months in the future.

If we read that case correctly, the financial exigency existed in the School of Engineering and Architecture. It was in that school the contract terms were applied after two courses of study were eliminated. We read the case to suggest a financial exigency in the School of Engineering and Architecture was sufficient cause to terminate Browzin's employment. The Dean emphasized he was motivated solely by financial considerations in making the difficult termination decision. At the close of plaintiff's case the trial court sustained defendant's motion to dismiss. The Court of Appeals affirmed.

Plaintiff cites Johnson v. Board of Regents of the University of Wisconsin System, 377 F. Supp. 227 (W. D. Wis., 1974), affirmed 510 F. 2d 975. In Johnson, tenured University faculty members who were terminated due to financial exigency brought suit claiming that they had been denied procedural due process. In denying the plaintiffs' motion for a preliminary injunction, the court held the Fourteenth Amendment did not require a tenured faculty member have any control over which department's budget was to be cut or in what amount it would be cut. In that case, the Legislature had cut appropriations and the court accepted the position that exigency was present and that some terminations were necessary. That case is not helpful except for language which supports the concept that the administration must be given a free hand in allocating financial problems to their sources.

Levitt v. Board of Trustees of Nebraska State Colleges, 376 F. Supp. 945 (Neb., 1974), cited by plaintiff, is a Nebraska Federal District Court case involving a situation where the Legislature had cut appropriations sufficiently to require some terminations. The plaintiffs were tenured instructors at Peru State College. The acting President of Peru made his recommendations for the termination of the plaintiffs and other faculty members. They were released because of the reduced budget, on the basis of objective evaluation of all the faculty members and the overall educational program. The court found the process utilized to select the plaintiffs for termination was fair and reasonable. It further determined that state college faculty members were not guaranteed any absolute constitutional right to continued employment even though they were tenured employees.

Plaintiff also cites the case of Mabey v. Reagan, 537 F. 2d 1036 (9th Cir., 1976), to support his proposition that financial exigency must exist at the Univer-

sity level. The holding in that case in no way deals with the question at which level a financial exigency must exist. The case involved the question of a First Amendment right, not a question of interpretation of the words "financial exigency." In fact, the term "financial exigency" was not found in the contract between the parties. The court merely referred to the term "financial exigency" citing the 1975 definition of that term given by the American Association of University Professors. However, the Mabey court specifically found the definition of the AAUP "is not binding upon us."

The Browzin court determined the cancellation of courses taught by the plaintiff was a discontinuance of a program of instruction. It therefore concluded the regulation based upon termination of appointment for financial exigency or bona fide discontinuance of a program was applicable. As heretofore suggested, Browzin is supportive of defendant's position. The Creighton faculty handbook provides for termination of an appointment based upon "financial exigency, which may be considered to include bona fide discontinuance of a program or department of instruction or the reduction in size thereof." The curtailing of the medicinal chemistry course in the School of Pharmacy is within the ambit of this provision.

The evidence supports a finding that plaintiff's termination was based upon a bona fide reduction in size of a program of instruction. For accreditation purposes and in order to obtain federal funding, the School of Pharmacy was required to emphasize its clinical pharmacy program. Medicinal chemistry, which plaintiff taught, was reduced to a 1 semester, 3 hours, course for freshman students. Another tenured faculty member, who had both rank and seniority over plaintiff, was qualified to teach medicinal chemistry as well as biochemistry. He assumed both these duties and plaintiff, who could

teach only medicinal chemistry, was released. The record fully supports a finding the process used to select plaintiff for termination was not only fair and reasonable but tended to maintain the most viable and best overall program for the School of Pharmacy within the financial limits of that college.

We do not accept the 1976 recommendation of the American Association of University Professors defining "financial exigency" so as to limit that term to an imminent crisis which threatens the survival of the institution as a whole. This definition was adopted several years subsequent to the execution of the contract being interpreted herein. It has no probative value as to the meaning of the term at the time of the contract.

Plaintiff's interpretation of the language "financial exigency on the part of the institution" entirely ignores the other provisions of the contract. To accept plaintiff's definition would require Creighton to continue programs running up large deficits so long as the institution as a whole had financial resources available to it. The inevitable result of this type operation would be to spread the financial exigency in one school or department to the entire University. This could likely result in the closing of the entire institution. We must construe the questioned language in the context of the contract as a whole. To accept plaintiff's interpretation of it would negate other provisions of the contract. In interpreting the intention of the parties a contractual provision must be interpreted in the light of other provisions of the contract. Midwest Lumber Co. v. Dwight E. Nelson Constr. Co., 188 Neb. 308, 196 N. W. 2d 377 (1972).

The rapidly changing needs of students and society demand that university administrators have sufficient discretion to retrench in areas faced with financial problems. Creighton University is a private institution. We can take judicial notice of the fact that many private universities are facing severe

financial crunches. When we consider only a single area we get an idea of the problem. The record indicates energy costs for Creighton University in a relatively short time have risen from $200,000 per year to $1,200,000.

If we read the record correctly, Creighton as an institution has less than $2,000,000 of unrestricted general funds available every year. Common sense dictates that plaintiff's contention is untenable. To sustain it, we must hold no tenured employee in any college may be released until the institution exhausts its total assets or at the very least reaches the point where its very survival as an institution is in jeopardy.

We specifically hold the term "financial exigency" as used in the contract of employment herein may be limited to a financial exigency in a department or college. It is not restricted to one existing in the institution as a whole.

The evidence is fairly conclusive the School of Pharmacy was faced with a financial exigency for the fiscal year 1976-1977. It had been operating with a deficit for the past 5 years. The deficit for 1974-1975 and 1975-1976 had reached $56,000 for each year. The deficit faced for 1976-1977 was in excess of $200,000. This deficit would be more than three times greater than any previous deficit.

The Vice President for Financial Affairs, who was Treasurer of Creighton University, testified the University generally subsidized each college in the amount of 6 to 7½ percent of the budget for that college. This subsidy came from the University general fund, which is made up of endowment earnings, Jesuit net contributed income, and gift income from the public. These sources total approximately $1,750,000 a year.

To continue the existing pharmacy program, the University would have been required to more than double the subsidy for that college, to the detriment

of its other schools. The Treasurer further testified Creighton University as a whole was in a delicate financial position. While stating the University was not then in a state of financial exigency, he did state it was on the edge of financial exigency. It was his further testimony that Creighton's endowment is only 1/10th of what it should have for a private university of its size.

For the reasons discussed above, the judgment of the District Court is correct and should be affirmed.

The judgment is affirmed.

AFFIRMED.