**Hertha H. KROTKOFF, Appellant,**

v.

**GOUCHER COLLEGE, Appellee.**

**No. 77–2395.**

United States Court of Appeals,
Fourth Circuit.

Argued June 9, 1978.

Decided Oct. 19, 1978.

Thomas Waxter, Jr. and David R. Owen, Baltimore, Md. (Mary Louise Smith, Semmes, Bowen & Semmes, Baltimore, Md., on brief), for appellant.

Francis D. Murnaghan, Jr., Baltimore, Md. (Nell B. Strachan, Baltimore, Md., on brief), for appellee.

(Laura Christian Ford, New Haven, Conn., on brief), for amicus curiae American Council on Education.

(Matthew W. Finkin, School of Law, Duke University, Dallas, Tex., on brief), for amicus curiae The American Association of University Professors.

Before HAYNSWORTH, Chief Judge, and BUTZNER, Circuit Judge, and D. DORTCH WARRINER, United States District Judge for the Eastern District of Virginia, sitting by designation.

BUTZNER, Circuit Judge:

This appeal arises from the termination of Hertha H. Krotkoff's position as a tenured professor at Goucher College.[1] Krotkoff sued Goucher, alleging that it violated the tenure provision of her contract. The college asserts that it eliminated Krotkoff's position and terminated her contract as part of a general retrenchment prompted by severe financial problems. The district court submitted the following issues to the jury, placing the burden of proof on the college in each instance:

---

1. Since Professor Kortkoff is an Austrian citizen, jurisdiction is based on 28 U.S.C. § 1332(a)(2).

(1) Was Goucher entitled to read into its contract of tenure with Krotkoff the condition of financial exigency; (2) Did the Trustees reasonably believe that a financial exigency existed at Goucher; (3) Did Goucher reasonably use uniform standards in selecting Krotkoff for termination; and (4) Did the College fail to make reasonable efforts to find Krotkoff alternate employment at Goucher? [2]

The court instructed the jury that it must find in favor of Goucher on all four issues for the college to prevail; conversely, it instructed that if the jury found in favor of Krotkoff on any one of the four issues, Krotkoff should recover damages. The jury returned a general verdict of $180,000 for Krotkoff, but the district judge, perceiving error, stated that he would grant a new trial.

Subsequently, upon the representations of the parties that no additional evidence could be presented at a new trial, the court entered judgment for the college notwithstanding the verdict. In the alternative, should the judgment be reversed on appeal, the court granted the college's motion for a new trial on the ground that "the jury's verdict was against the overwhelming weight of the evidence." Satisfied that the college has met the stringent requirements for a judgment notwithstanding the verdict, we affirm. [3]

## I

Krotkoff began teaching German at Goucher in 1962 and was granted "indeterminate tenure" in 1967. In June of 1975, the college notified Krotkoff that because of financial problems, it would not renew her 1975–76 contract when it expired on June 30, 1976. The college acknowledges that Krotkoff has at all times been a fine teacher and that the termination was not based on her performance or behavior.

Goucher is a private, liberal arts college for women in Towson, Maryland. Beginning in 1968–69, the college operated at a deficit each academic year through 1973–74. The deficit for 1973–74 was $333,561, and the total deficit from 1968–69 through 1973–74 was $1,590,965. By the end of the 1973–74 year, the college's expendable endowment, which was used to cover these deficits, amounted to less than one-half of the 1973–74 deficit. In 1974–75, as a result of a substantial reduction in expenditures, the college showed a meager surplus of $1,482. This was increased to $5,051 in 1975–76, but, partially as a result of a revision of the curriculum to attract more students, the deficit in 1976–77 was anticipated to be in excess of $100,000. The college's enrollment fell every year from 1969–70 through 1976–77, reducing revenue generated by tuition and fees, a major source of income.

This financial situation convinced the trustees that action was needed to insure the institution's future. After a review of the finances and curriculum, the board adopted a more aggressive investment policy to seek a higher rate of return on endowment and promoted rental of the auditorium and excess dormitory space. It also froze salaries, cut administrative and clerical staffs, and deferred maintenance.

As a part of its retrenchment, the college did not renew the contracts of 11 untenured and four tenured faculty members, including Krotkoff. These professors were selected largely on the bases of the dean's study of enrollment projections and necessary changes in the curriculum. In addition, the faculty elected a committee to review cur-

**2.** This summary of the issues has been quoted from the appellant's brief, p. 2.

**3.** *Burcham v. J. P. Stevens & Co.*, 209 F.2d 35, 37 (4th Cir. 1954), states these requirements as follows:

> It is well settled that . . . on motion for judgment n.o.v. . . ., the evidence must be considered in the light most favorable to the party against whom . . . the judgment n.o.v. is asked, that any conflict in evidence must be resolved in his favor and that every conclusion or inference that can be legitimately drawn therefrom in his behalf must be drawn.

*See also Wratchford v. S. J. Groves & Sons Co.*, 405 F.2d 1061, 1066 (4th Cir. 1969); 9 Wright & Miller, Federal Practice and Procedure § 2524 (1971).

ricular changes suggested by the administration. Among the administration's proposals were elimination of the classics department and the German section of the modern language department which were staffed exclusively by tenured professors. The classics department was dropped, but the faculty committee recommended that the college continue a service program in German staffed by one teacher for students majoring in other disciplines who needed the language as a research skill. The administration accepted this recommendation.

The German faculty consisted of Krotkoff, who taught mostly advanced literature courses, and another tenured teacher, Sybille Ehrlich, who taught chiefly introductory language courses. The dean, concurring with the chairman of the department, recommended retention of Ehrlich primarily because she had more experience teaching the elementary language courses that would be offered in a service program and because she was also qualified to teach French. The president followed this recommendation.

The faculty grievance committee, to which Krotkoff then turned, applied the criteria by which the college faculty were regularly evaluated and recommended her retention. The committee, however, did not suggest that Ehrlich's appointment be terminated, and it did not address the problem of keeping both tenured professors. The president declined to accept the committee's recommendation, and the trustees sustained her decision. The president also rejected a suggestion that both teachers be retained by assigning Krotkoff to teach the German courses, dismissing an assistant dean, and designating Ehrlich as a part time French teacher and a part time assistant dean.

Goucher sent Krotkoff a list of all positions available for the next year. Krotkoff insisted that any new position carry her present faculty rank, salary, and tenure. She expressed interest in a position in the economics department, but the school de-

clined to transfer her because the department's chairman estimated that she would need two to four years of training to become qualified.

In accordance with its notice of June 1975, the college terminated her appointment on June 30, 1976.

## II

■ The primary issue is whether as a matter of law Krotkoff's contract permitted termination of her tenure by discontinuing her teaching position because of financial exigency.

The college's 1967 letter to Krotkoff granting her "indeterminate tenure" does not define that term. The college by-laws state:

> No original appointment shall establish "tenure," i. e., the right to continued service unless good cause be shown for termination. Reappointment as Professor or Associate Professor, after three years of service in either rank, or appointment or reappointment to any professorial rank after five years of service as Instructor or in any higher rank, shall establish tenure. The term "service" as used in this section shall mean instructional service in full-time appointments.

The by-laws also specify that the college may terminate a teacher's employment at age 65 or because of serious disability or cause. The parties agree that Krotkoff's appointment was not terminated for any of these reasons. Financial exigency is not mentioned in the by-laws, and the college concedes that it is not considered to be a ground of dismissal for cause.[4]

The national academic community's understanding of the concept of tenure incorporates the notion that a college may refuse to renew a tenured teacher's contract because of financial exigency so long as its action is demonstrably bona fide. Dr. Todd Furniss, Director of the Office of Academic Affairs of the American Council on Education, testified on behalf of Goucher:

---

4. The college's concession appears to conform to the general understanding of the academic community.

The [common] understanding was that the person who held tenure would be employed for an indeterminate or indefinite period up to retirement, unless two conditions held. The first condition would be some inadequacy on that person's part, either incompetency or neglect of duties or moral turpitude.

In that instance, the person was guaranteed that he would not be dismissed without the institution's being ready to submit formal charges and the opportunity to answer those charges, if he desired in a hearing, with the burden of proving the charges upon the institution.

Now, that is instance number one.

The second instance under which the tenure contract might be terminated is a group that includes, of course, death, includes disability, includes resignation, obviously, but chiefly includes what has been called financial exigency.

Dr. Furniss based his opinion in part on the 1940 Statement of Principles on Academic Freedom and Tenure which was developed by the Association of American Colleges and the American Association of University Professors. This statement was later adopted by a number of professional organizations. With respect to the security afforded by tenure, the statement explains:

After the expiration of a probationary period, teachers or investigators should have permanent or continuous tenure, and their services should be terminated only for adequate cause, except in the case of retirement for age, or under extraordinary circumstances because of financial exigencies.

In the interpretation of this principle it is understood that the following represents acceptable academic practice:

.    .    .    .    .

(5) Termination of a continuous appointment because of financial exigency should be demonstrably bona fide.

Probably because it was formulated by both administrators and professors, all of the secondary authorities seem to agree that it is the "most widely-accepted academic definition of tenure." Brown, Tenure Rights in Contractual and Constitutional Context, 6 Journal of Law and Education 279, 280 (1977). *See also,* M. Mix, Tenure and Termination in Financial Exigency 4 (1978); Byse, Academic Freedom, Tenure, and the Law, 73 Harv.L.Rev. 304, 305 (1959).

The reported cases support the conclusion that tenure is not generally understood to preclude demonstrably bona fide dismissal for financial reasons. In most of the cases, the courts have interpreted contracts which contained an explicit reference to financial exigency. *See, e. g., Browzin v. Catholic University,* 174 U.S.App.D.C. 60, 527 F.2d 843 (1975); *Bellak v. Franconia College,* 386 A.2d 1266 (N.H.1978); *American Association of University Professors v. Bloomfield College,* 129 N.J.Super. 249, 322 A.2d 846 (Ch.Div.1974), *aff'd,* 136 N.J.Super. 442, 346 A.2d 615 (App.Div.1975); *Scheuer v. Creighton University,* 199 Neb. 618, 260 N.W.2d 595 (1977). In others, where the contracts did not mention this term, the courts construed tenure as implicitly granting colleges the right to make bona fide dismissals for financial reasons. *See Johnson v. Board of Regents,* 377 F.Supp. 227, 234–35 (W.D.Wis.1974), *aff'd,* 510 F.2d 975 (7th Cir. 1975) (table); *Levitt v. Board of Trustees,* 376 F.Supp. 945 (D.Neb.1974); *cf. Rehor v. Case Western Reserve University,* 43 Ohio St.2d 224, 331 N.E.2d 416 (1975). No case indicates that tenure creates a right to exemption from dismissal for financial reasons. As one commentator has noted: "In whatever way the courts have chosen to view the quality of the right or interest the tenured faculty member holds, there is little doubt that tenure is not enforceable if financial exigency is claimed and supported." M. Mix, Tenure and Termination in Financial Exigency 10 (1978).

A concept of tenure that permits dismissal based on financial exigency is consistent with the primary purpose of tenure. Tenure's "real concern is with arbitrary or retaliatory dismissals based on an administrator's or a trustee's distaste for the content of a professor's teaching or research, or even for positions taken completely outside the campus setting.    .    .    .    It is de-

signed to foster our society's interest in the unfettered progress of research and learning by protecting the profession's freedom of inquiry and instruction." *Browzin v. Catholic University,* 174 U.S.App.D.C. 60, 63, 527 F.2d 843, 846 (1975). *See also Rehor v. Case Western Reserve University,* 43 Ohio St.2d 224, 331 N.E.2d 416, 421 (1975); Note, Dismissal of Tenured Faculty for Reasons of Financial Exigency, 51 Ind.L.J. 417 n.2 (1976). Dismissals based on financial exigency, unlike those for cause or disability, are impersonal; they are unrelated to the views of the dismissed teachers. A professor whose appointment is terminated because of financial exigency will not be replaced by another with more conventional views or better connections. Hence, bona fide dismissals based on financial exigency do not threaten the values protected by tenure.

Parties to a contract may, of course, define tenure differently in their agreement. But there is no significant evidence that Krotkoff and Goucher contracted with reference to a peculiar understanding of tenure. The Goucher by-laws and other relevant documents do not define the rights and obligations of tenured teachers during financial exigency. The only evidence of a peculiar understanding of tenure at Goucher was the testimony of Krotkoff and three other tenured professors, whose appointments had been terminated, that they understood tenure at Goucher to preclude dismissal for financial reasons. Four other tenured faculty members testified to a contrary understanding. None of these witnesses relied on any policy established by the trustees regarding the effect of financial exigency on tenure; the conclusions they expressed were largely subjective. The college introduced evidence that during the depression of the 1903's it had been forced to terminate the appointments of tenured professors because of its precarious financial condition. The former president of the college who signed Krotkoff's letter conferring "indeterminate tenure" testified that he used this phrase in light of the general understanding in the academic world that tenure would terminate if the position to which the professor had been appointed were eliminated either for lack of funds or lack of students.

In sum, there was no evidence of a general understanding in the Goucher community that the tenured faculty had greater protection from dismissal for financial reasons than the faculty at other colleges. The Krotkoff-Goucher contract must be interpreted consistently with the understanding of the national academic community about tenure and financial exigency. Although Judge McGowan addressed a different factual situation in *Greene v. Howard University,* 134 U.S.App.D.C. 81, 88, 412 F.2d 1128, 1135 (1969), his comments are appropriate here:

> Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is. The readings of the market place are not invariably apt in this non-commercial context.

By defining Krotkoff's relationship with the college in terms of tenure, the contract did not exempt her from demonstrably bona fide dismissal if the college confronted financial exigency. *See* Note, Financial Exigency as Cause for Termination of Tenured Faculty Members in Private Post Secondary Educational Institutions, 62 Iowa L.Rev. 481, 508–09 (1976).

### III

Having determined that Krotkoff's contract permitted termination of her employment because of financial exigency, we consider whether the district court erred in holding as a matter of law that the college did not breach this contract.

Krotkoff urges that the jury was entitled to assess the reasonableness of the trustees' belief that the college faced financial exigency. In support of this position, she emphasizes that the college had a large endowment and valuable land. She is entitled, she claims, to have a jury determine whether the trustees acted unreasonably in failing

to secure judicial permission to invade these assets and whether the trustees should have sold land which they were holding for a better price.

■ Courts have properly emphasized that dismissals of tenured professors for financial reasons must be demonstrably bona fide. Otherwise, college administrators could use financial exigency to subvert academic freedom. The leading case on this aspect of tenure is *American Association of College Professors v. Bloomfield College,* 129 N.J.Super. 249, 322 A.2d 846 (Ch. Div.1974), *aff'd,* 136 N.J.Super. 442, 346 A.2d 615 (App.Div.1975). There, the court concluded that Bloomfield College used its genuine financial difficulties as a subterfuge to achieve its goal of abolishing tenure at the institution. Since Bloomfield acted in bad faith, the court ordered it to reinstate the tenured teachers that it had dismissed.[5]

■ *Bloomfield,* however, establishes that the trustees' decision to sell or retain a parcel of land was not a proper subject for judicial review:

> Whether . . . [the sale of land] to secure financial stability on a short-term basis is preferable to the long-term planning of the college administration is a policy decision for the institution. Its choice of alternative is beyond the scope of judicial oversight in the context of this litigation. Hence the emphasis upon the alternative use of this capital asset by the trial judge in reaching his conclusion that a financial exigency did not exist was unwarranted and should not have been the basis of decision. 346 A.2d at 617.

The same principle, we believe, should apply to the dissipation of an endowment. The reasonableness of the trustees' decision concerning the disposition of capital did not raise an issue for the jury. Stated otherwise, the existence of financial exigency should be determined by the adequacy of a college's operating funds rather than its capital assets. *See* Note, The Dismissal of Tenured Faculty for Reasons of Financial Exigency, 51 Ind.L.J. 417, 420–23 (1976); *cf. Scheuer v. Creighton University,* 199 Neb. 618, 260 N.W.2d 595, 599–601 (1977).

■ Krotkoff has acknowledged that the trustees and other college officials did not act in bad faith. The evidence overwhelmingly demonstrates that the college was confronted by pressing financial need. As a result of the large annual deficits aggregating more than $1,500,000 over an extended period and the steady decline in enrollment, the college's financial position was precarious. Action undoubtedly was required to secure the institution's future. Because of Krotkoff's disavowal of bad faith on the part of the college and because of the unrefuted evidence concerning the college's finances and enrollment, we believe that this aspect of the case raised no question for the jury. The facts and all the inferences that properly can be drawn from them conclusively establish that the trustees reasonably believed that the college was faced with financial exigency. We therefore hold that with respect to this issue, the district court correctly entered judgment for the college notwithstanding the verdict.

## IV

We turn next to Krotkoff's claim that the court properly submitted to the jury whether Goucher used reasonable standards in deciding not to retain Krotkoff and whether it made reasonable efforts to find her another position at the college.

The college asserts that neither of these issues is a proper subject for judicial review. It relies on a number of cases in which courts have evinced reluctance to oversee the decisions of college administrators or to intrude on the prerogatives of trustees.[6] These cases, however, generally

---

5. Bloomfield, a small private college, subsequently petitioned for relief under Chapter XI of the Bankruptcy Act. *See* Note, The Dismissal of Tenured Faculty for Reasons of Financial Exigency, 51 Ind.L.J. 418, 423 n.30 (1976).

6. *See, e. g., Board of Curators v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 955, 55 L.Ed.2d 124 (1978); *Shaw v. Board of Trustees,* 549 F.2d 929, 932 (4th Cir. 1976); *Faro v. New York University,* 502 F.2d 1229, 1231 (2d Cir. 1974); *Peters v. Middlebury College,* 409 F.Supp. 857, 868 (D.Vt.1976).

have involved the application of the fourteenth amendment to state institutions or the interpretation of statutes prohibiting racial or sexual discrimination. Since Goucher is a private college and Krotkoff does not allege the type of unlawful conduct proscribed by civil rights acts, the cases on which the college relies to forestall judicial inquiry are not dispositive.

■ Krotkoff's claims must be resolved by reference to her contract. This involves ascertaining, first, what contractual rights she had, and second, whether the college breached them. Viewing the evidence in the light most favorable to Krotkoff, as we must for purposes of this appeal, we believe that the district court correctly held that she was contractually entitled to insist (a) that the college use reasonable standards in selecting which faculty appointments to terminate, and (b) that it take reasonable measures to afford her alternative employment.

Neither the letter granting Krotkoff tenure nor the documents setting forth Goucher's policy concerning tenure mentions the procedural rights to which a faculty member is entitled when the college proposes to terminate her appointment for financial reasons. Therefore, we must examine again the academic community's understanding concerning tenure to determine the nature of this unique contractual relationship.

■ As we mentioned in Part II, the 1940 Statement on Academic Freedom and Tenure sanctions termination of faculty appointments because of financial exigency. But it also stipulates: "Termination of a continuous appointment because of financial exigency should be demonstrably bona fide." The evidence discloses that the academic community commonly understands that inherent in the concept of a "demonstrably bona fide" termination is the requirement that the college use fair and reasonable standards to determine which tenured faculty members will not be reap-

pointed. The college's obligation to deal fairly with its faculty when selecting those whose appointments will be terminated is an attribute of tenure. Consequently, it is an implicit element of the contract of appointment.

■ Nevertheless, the evidence questioning the reasonableness of Goucher's procedures was insufficient to submit this issue to the jury. The necessity for revising Goucher's curriculum was undisputed. A faculty committee accepted elimination of the classics department and reduction of the German section of the modern language department as reasonable responses to this need. The only substantial controversy was whether the college should have retained Krotkoff or Ehrlich, both tenured professors. Nothing in Krotkoff's contract gave her precedence, and the college did not breach it by retaining Ehrlich instead of Krotkoff. Nor was the college under any contractual obligation to retain Krotkoff by demoting Ehrlich to part time teaching and part time administrative work. Therefore, the district court did not err in ultimately ruling for the college on this issue.

■ Whether the college was contractually obliged to make reasonable efforts to find Krotkoff alternate employment at Goucher was the subject of conflicting evidence. It is reasonable, however, to infer from the evidence that a demonstrably bona fide termination includes this requirement. *See,* Note, Financial Exigency as Cause for Termination of Tenured Faculty Members in Private Post Secondary Educational Institutions, 62 Iowa L.Rev. 481, 504–05 (1976); *cf. Browzin v. Catholic University,* 174 U.S.App.D.C. 60, 64, 527 F.2d 843, 847 (1975). On the other hand, in the absence of an explicit contractual undertaking, the evidence discloses that tenure does not entitle a professor to training for appointment in another discipline. *Cf. Browzin v. Catholic University,* 174 U.S.App.D.C. 60, 67–68, 527 F.2d 843, 850–51 (1975).

The evidence conclusively establishes that the college did not breach any contractual obligation concerning alternative employment. The constraints of tenure, rank, and pay that Krotkoff placed on alternative employment severely restricted the college's efforts to accommodate her. Apart from Ehrlich's position, the only vacancy in which she expressed interest was in the economics department. No evidence suggested that the head of that department or the president acted unreasonably in assessing the time and expense of retraining Krotkoff for this position or in deciding that her transfer would not be feasible. Again, we conclude that the district judge did not err in holding that the college was entitled to judgment on these issues.

The judgment is affirmed.