Raul Medina JIMENEZ, et al.,
Plaintiffs, Appellants

v.

Ismael ALMODOVAR, et al.,
Defendants, Appellees.

No. 80–1542.

United States Court of Appeals,
First Circuit.

Argued March 3, 1981.

Decided June 9, 1981.

Rehearing and Rehearing En Banc
Denied July 21, 1981.

---

Carlos V. Garcia Gutierrez, Hato Rey, P. R., for plaintiffs, appellants.

Jose A. Andreu-Garcia, with whom Manuel E. Andreu-Garcia, Hato Rey, P. R. and Victor E. Baez, Mayaguez, P. R., were on brief, for defendants, appellees.

Before BOWNES and BREYER, Circuit Judges, and WYZANSKI, Senior District Judge.[*]

WYZANSKI, Senior District Judge.

Two professors, whose employment a public university had terminated solely because it eliminated their positions as unnecessary because of a *bona fide* change of its academic program, brought this 42 U.S.C. § 1983 action against the university, its president, and others on the ground that they, in terminating the plaintiffs' employment, deprived them of their property without the due process of law guaranteed by the Fifth or the Fourteenth Amendment [1] to. the United States Constitution. The plaintiffs appeal from a judgment for the defendants. The essential facts are undisputed.

The University of Puerto Rico is a public instrumentality created by Act No. 1 of January 20, 1966, as amended. 18 LPRA §§ 601–614. It operates a number of separate institutional units each having a substantial degree of academic and administrative autonomy. 18 LPRA §§ 603, 606. The Council on Higher Education is the governing board of the university system. 18 LPRA § 602(f)(1). Among the Council's duties is to pass on appeals taken against decisions of the president of the university. 18 LPRA § 602(e)(6).

Humacao University College until 1975 was a Regional College. Act No. 1 of January 20, 1966, 18 LPRA § 611(d), gave the University of Puerto Rico general jurisdic-

---

[*] Of the District of Massachusetts, sitting by designation.

1. The Supreme Court "thus far has declined to say whether it is the Fifth Amendment or the Fourteenth which provides" due process of law protection against Puerto Rican official action. *Examining Board v. Flores de Otero*, 426 U.S. 572, 601, 96 S.Ct. 2264, 2280, 49 L.Ed.2d 65 (1976).

tion of Humacao, but Humacao retained its separate academic faculty.

On January 14, 1972 the Council on Higher Education approved for the then Humacao Regional College a program for an associate degree in physical education and recreation to be conducted as a pilot program (hereafter called "the pilot program"), the duration of which was made dependent upon a subsequent evaluation.

The university on September 1, 1970 employed Maria L. Garcia-Feliciano as a temporary instructor and two years later assigned her to the pilot program. On August 15, 1972, the university gave the plaintiffs—Raul E. Medina Jimenez and Jorge H. Garofalo Pastrana—temporary appointments in the pilot program. On July 1, 1977 the then president of the University wrote to each of the three persons just named identical letters having the following text:

> In accordance with the powers granted me by the Law of the University of Puerto Rico, approved on 20 January 1966 in its Article 5C(8), I appoint you a permanent member of the University teaching staff by virtue of the dispositions of the said law in its Article 14B.

> This permanent appointment is effective as of 1 July 1977 and by the same you are incorporated in the group of regular collaborators which integrate the Institution.

In the pre-trial agreement in this case it has been stipulated that the foregoing July 1, 1977 letters appointed each of the plaintiffs "a tenured professor of the University of Puerto Rico."

On July 19, 1978 the current president of the university—the defendant Ismael Almodovar—wrote to each of the aforesaid three persons identical letters having the following text:

> At a meeting held on 11 July 1978, the Council on Higher Education decided to inactivate the Associate Degree Program in Physical Education of the Humacao University College. This decision results from a series of factors, among them, the slight enrollment which has been benefiting from the program, the evaluation of the program recently carried out and the recommendations of the Department's Director and of the College, Dr. Federico Matheu. As a result of the recent action, it is necessary to eliminate three of the five teaching positions of the Physical Education Department at the Humacao College, since the teaching activity in that Department will be reduced to one of services to the other teaching programs of the College.

> I am sorry to inform you that, after taking various objective factors into consideration, one of the positions to be eliminated will be the one currently occupied by you. As a result of this programmatic reduction we must do without your services as part of our College's teaching staff as of 15 August 1978.

> As was determined by the Council on Higher Education itself, we have communicated with the chancellors and directors of other institutional units with offerings in the field of physical education to explore the possibility of relocating in one of the units of the University System, with reference to those programs' needs, the professors harmed by this action. Should any such possibility turn up, we will communicate with you immediately. With the purpose of allowing us to offer the directors and chancellors information about you I would be obliged, if you think it convenient, that you send us your "curriculum vitae."

> . . . .

Each of the two teaching positions of the Physical Education Department which were not eliminated was held by a professor senior to the three recipients of the aforesaid letter.

The plaintiffs do not question that the university in reducing the number of professors in the Physical Education Department acted in good faith, exclusively for the reasons stated in the July 19, 1978 letter, and without any motive or intention to dismiss the plaintiffs on "personal grounds" —a term here used to include not only dismissals for cause, or for fault, or for

deficiency of any kind, but also to include dismissals reflecting any superior's personal attitude toward a plaintiff or any other individual.

Nor do the plaintiffs question that if eliminations were justified, the university, in selecting for elimination the plaintiffs rather than the two professors who were not eliminated, acted in good faith, on the basis of an appropriate standard of seniority of service and not on "personal grounds," as above defined.

On July 26, 1978, the plaintiffs were given an informal hearing by Mr. Pedro Juan Barbosa, assistant to President Almodovar, whom the president, being ill, had designated as his representative for the hearing. Mr. Barbosa informed the plaintiffs that seniority was the only criterion on which the president had based his decision. He also invited them to set forth any grievances or challenges they might make against the decision under which their employment would terminate on August 15, 1978. None was raised by the plaintiffs at that time.

The plaintiffs have never appealed from the president's July 19, 1978 decision effective August 15, 1978 eliminating their positions and terminating their employment. It is inferable that they knew that such an appeal was available because, to the knowledge of plaintiff's counsel, their colleague Maria L. Garcia-Feliciano appealed, pursuant to 18 LPRA § 602(e)(6), the decision against her to the Council on Higher Education. The Council has ordered a full evidentiary hearing of her appeal before a hearing examiner, pursuant to Articles 6, 10, 11 and 12 of Chapter IX of its by-laws, but, in accordance with a stipulation of the parties, the Council stayed the hearing pending the outcome of the present action.

Meanwhile, President Almodovar had been seeking to secure positions within the university for the plaintiffs. On July 19, 1978, the very day he transmitted to the plaintiffs and Maria L. Garcia-Feliciano the termination letters, the president directed to each of the chancellors and directors of the other university colleges within the university an inquiry as to whether any position was available for any of the three professors being eliminated. The president pursued these inquiries by telegrams sent at a later date.

On August 2, 1978, the Aguadilla College of the University of Puerto Rico employed Maria L. Garcia-Feliciano, who was senior to the plaintiffs, at the same rank and salary she had enjoyed at Humacao University College.

On September 6, 1978, the president offered both the plaintiffs the only teaching position then available at the Carolina Regional College of the University of Puerto Rico. At the same time, the president offered to the plaintiff Medina Jimenez, and later offered to the other plaintiff, Garofalo, an administrative position at Humacao University College. Medina Jimenez accepted effective October 2, 1978 the teaching position at Carolina Regional College, with the same rank and salary he enjoyed at Humacao University College. He still holds that position. He has also received retroactively to August 15, 1978 his salary. The other plaintiff, Garofalo, did not accept any position then or later.

On April 5, 1979, the president of the university offered plaintiff Medina Jimenez a teaching position in Humacao University College—a position which was in every respect similar to the one he had previously held in that college, including tenure and rank, plus an administrative, tenured position as the administrator of the new sports facilities in said college. The president offered plaintiff Garofalo the position occupied by plaintiff Medina Jimenez in the Carolina Regional College "that will be left vacant by the latter in case he accepts the offer made to him." Both positions were to be occupied immediately, retroactively as of April 1, 1979. On August 11, 1979, Medina Jimenez declined the offer made to him, so the Carolina position did not become available to Garofalo.

On July 28, 1978, the plaintiffs filed in the district court a complaint alleging that the defendants had taken their property without due process of law and had denied

them the equal protection of the laws,[2] and seeking an injunction ordering the defendants "to continue the plaintiffs in their posts as tenured teaching staff of the University of Puerto Rico" and a payment of "their back salaries in full." Without a jury, the district judge heard the evidence, made findings, and, dismissing the complaint, entered judgment for the defendants.

The plaintiffs appealed. Inasmuch as there is no significant difference in the status of the plaintiff Medina Jimenez and the plaintiff Garofalo, we shall, for convenience, hereafter address the opinion principally to Medina Jimenez's case and to his claim that the defendants deprived him of his property and his liberty without due process of law.[3]

Medina Jimenez's principal contention is that the defendants deprived him of his *property* rights under Puerto Rican law, including his right under 18 LPRA § 613(c) not to be deprived of his position without a hearing in which charges are preferred and he has an opportunity to defend himself. We do best to reach that contention against a broad background.

■ Such property rights as Medina Jimenez has were created by the law of Puerto Rico, not by the United States Constitution. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). It having been stipulated that he is a "tenured professor of the University of Puerto Rico," we shall assume that he had property rights[4] of which he cannot be deprived

without due process of law. *Perry v. Sindermann, supra.* But those property rights were only sketchily outlined by the express terms of the July 1, 1977 contract letter: the letter written by the president of the University of Puerto Rico [not by the head of Humacao University College] made Medina Jimenez "a permanent member of the University [not merely of Humacao University College] teaching staff" and "incorporated [him] in the group of regular collaborators which integrate the Institution." No reference was made to his salary, exact title, relationship to any discipline, program, department, or college, or to any university regulations, or to the university's right to terminate his employment. There is an obvious need to fill in this outline with implied terms and conditions of employment.

In filling in the implied terms and in interpreting the contract, the most important sources are any relevant university regulations, such as those adopted pursuant to 18 LPRA § 602(e)(12), or § 608(b), or § 613(b) and (c), or local statutes, such as 18 LPRA § 613(c). Cf. *Browzin v. Catholic University of America*, 527 F.2d 843, 845, 848 (D.C.Cir.1975).

■ In performing those functions, we are bound by relevant decisions of the Puerto Rico courts or, in their absence, by principles of American law, not of civil law. *Belaval v. Secretary of the Treasury*, 83 PRR 244, 247 (1961).

We have not found any Puerto Rican authorities which govern this case.

---

2. The plaintiffs abandoned in the district court and here their equal protection claim.

3. The complaint does not invoke and the briefs do not refer to our potential pendent jurisdiction to decide any case the plaintiffs may have based on the local law of Puerto Rico; and we rule there is not before us any case resting exclusively on the local law.

4. The plaintiffs have consistently contended that their appointment, not having been limited by any express condition in the July 1, 1977

letters, was not limited by any implied condition so that it would expire when the pilot project ceased. There is no finding of the district court that there was such an implied limitation. We, therefore, do not assume that under the Puerto Rican law of contracts the plaintiffs' property rights ceased when the pilot project terminated and that, as a consequence, they no longer had any "property" to be protected under the due process clause.

American courts[5] and secondary authorities[6] uniformly recognize that, unless otherwise provided in the agreement of the parties, or in the regulations of the institution, or in a statute, an institution of higher education has an implied contractual right to make in good faith an *unavoidable* termination of right to the employment of a tenured member of the faculty when his position is being eliminated as part of a change in academic program. The American court decisions are consistent with the *1940 Statement of Principles on Academic Freedom and Tenure* widely adopted by institutions of higher education and professional organizations of faculty members. 60 AAUP Bulletin 269–272 (1974). See *Bignall v. North Idaho College, Browzin v. American Catholic University,* and *Scheuer v. Creighton University, supra.* That the institution has an implied right of *bona fide* unavoidable termination due to changes in academic program is wholly different from its right of termination for cause or on other personal grounds is plainly recognized in the following definition of tenure of the Commission on Academic Tenure in Higher Education, *Faculty Tenure: A Report and Recommendations* (1973):

> "[A]n arrangement under which faculty appointments in an institution of higher education are continued until retirement for age or disability, subject to dismissal for adequate cause or unavoidable termination on account of financial exigency or

change of institutional program." (Emphasis in original omitted.)

The foregoing authorities lead to the conclusion that, unless a Puerto Rican statute or a university regulation otherwise provides, the instant contracts should be interpreted as giving the University of Puerto Rico an implied right of *bona fide* unavoidable termination on the ground of change of academic program.

■ There are no preclusive Puerto Rican statutes. The plaintiffs' reliance on 18 LPRA § 613(c) is misplaced. Section 613(c) provides that:

> "No member of the University personnel whose appointment is of a permanent character may be removed without the previous preferment of charges and an opportunity to defend himself."

The text and the underlying purpose of § 613(c) make it evident that, like comparable state statutes governing the removal of faculty members for cause, § 613(c) is limited to removals based on *ad hominem* or personal grounds which "touch the qualifications or performance of the professor's duties, showing that he is not a fit or proper person to hold the position." *State ex rel Richardson v. Board of Regents,* 70 Nev. 144, 261 P.2d 515 (1953); *Ziegler v. City Manager,* 115 N.J.L. 328, 180 A. 225, 226 (1925). See Brown, *Tenure Rights in Contractual and Constitutional Context,* 6 J. Law & Ed. 280, 281–282 (1977). By itself,

---

**5.** Members of faculties of *private* universities who have been dismissed because of an elimination of positions on account of *bona fide* changes of academic program, or on account of financial exigency, or both, were denied *contractual* claims in *Krotkoff v. Goucher College,* 585 F.2d 675 (4th Cir. 1978); *Browzin v. Catholic University of America,* 527 F.2d 843 (D.C. Cir. 1975); and *Scheuer v. Creighton University,* 199 Neb. 618, 260 N.W.2d 595 (1977). Members of faculties of *public* universities dismissed on similar grounds were denied both their contractual and their constitutional claims in *Bignall v. North Idaho College,* 538 F.2d 243, 246 (9th Cir. 1976) and *Johnson v. Board of Regents,* 377 F.Supp. 227 (W.D. Wis. 1974) aff'd without opinion, 510 F.2d 975 (7th Cir. 1975).

**6.** A comprehensive and carefully analyzed treatise containing leading cases and other relevant material has been recently published. H. T. Edwards and V. D. Nordin, *Higher Education and The Law* (Institute for Educational Management, Harvard University 1979), see particularly pp. 220–288. *See also* Commission on Academic Tenure in Higher Education, *Faculty Tenure: A Report and Recommendations* (1973); C. Byse and L. Joughin, *Tenure in American Higher Education: Plans, Practices and the Law* (1959), pp. 49–57; authorities collected in *Beitzell v. Jeffrey,* 643 F.2d 870, footnote 8; (1st Cir. 1981); Developments In The Law—Academic Freedom, 81 Harv.L.Rev. 1045 (1968); Matheson, *Judicial Enforcement of Academic Tenure:* An Examination, *50 Wash.U.L. Rev. 597 (1975);* Financial Exigency As Cause For Termination of Tenure of Faculty Members in Private Post Secondary Education Institutions, *62 Iowa L.Rev. 481 (1976);* Peterson, The Dismissal of Tenured Faculty for Reasons of Financial Exigency, *51 Indiana L.J. 417 (1976).*

the use of the word "removed" strongly suggests that the statute is addressed to a movement of a person out of a position rather than to the elimination of a position. Of greater significance is the fact that the procedure prescribed by § 613(c) with its reference to the "preferment of charges" and the "opportunity to defend" is tailored to the removal of a person on account of his personal fault or deficiency and is unsuitable for the resolution of a controversy as to the authenticity of the reasons asserted by an institution for the termination of a faculty member's position and as to the reasonableness of the standards employed to single out his position for elimination. *See Browzin v. Catholic University of America,* 527 F.2d 843, 847 (D.C.Cir.1975); Finkin, *The Limits of Majority Rule in Collective Bargaining,* 64 Minn.L.Rev. 183, 244 (1980). Moreover, it is a reasonable inference that when the Puerto Rican legislature enacted § 16 of Act No. 135, Laws of Puerto Rico, 1942, and Act No. 334, Laws of Puerto Rico, 1949 which are the source of § 613 of 18 LPRA, the legislature, being aware of and intending to preserve the distinction drawn by the *1940 Statement of Principles on Academic Freedom and Tenure* between a dismissal for cause or other personal grounds and a dismissal for impersonal institutional reasons, had a purpose to limit what is now

§ 613(c) to *ad hominem* dismissals for cause, or other personal grounds.[7]

So far as we know, there are no relevant regulations. The only University of Puerto Rico regulation cited to us has no bearing upon the issues in this case. It does not impose any duty upon the university, nor give a faculty member any right; on the contrary, it gives the university a right to impose upon a faculty member a duty to do a full week's work for a full week's pay.[8]

■ Having concluded that the university had an implied right of *bona fide* unavoidable termination of the contracts of the tenured members of the faculty on the ground of change of academic program, and that such right could be exercised by a procedure different from the one set forth in 18 LPRA § 613(c), we now consider what procedure the university did afford the plaintiffs and examine it in the light of the *procedural* aspects of the due process clause. The plaintiffs, as they presumably knew, had the right to a hearing by an intramural administrative tribunal[9] which was empowered to receive evidence, to direct that the university give the plaintiffs employment substantially equivalent to their last employment, and probably to award damages, 18 LPRA § 602(e)(6). The decision of the tribunal was subject to review by a Puerto Rican court which had even greater powers. *Gonzalez Saldana v.*

---

7. Nothing that we have said implies that § 613(c) does not apply where a faculty member alleges that in bad faith the institution terminated his employment ostensibly because of a change in program which eliminated his position, but with the real purpose of removing him on personal grounds.

8. Chapter V of the University of Puerto Rico Regulations is addressed to the right of the university to impose upon a faculty member a duty to perform so many hours of academic work. Chapter V, Article 1, provides that "the assignment of academic work shall be done by the deans." Article 2 provides that "the regular academic workload of the teaching staff shall not be more than fifteen nor less than twelve credit hours per week." We need not pause to consider Articles 3, 4, and 5. Article 6 provides that "in the absence of a minimum regular workload no member of the teaching staff shall receive remuneration for work performed in extramural or night courses." Article 7, upon which the plaintiffs rely, provides that "When there is not sufficient work in the regular courses of the University to complete a

teacher's regular academic workload, he shall be assigned work in extramural or night courses. If the professor refuses to accept work in extramural or night course, a corresponding reduction in his salary shall be made." Thus it is plain that the purpose of Article 7 is not to give rights to a member of the faculty but to impose upon a faculty member a duty to give a full week's work for a full salary. This regulation does not impose upon the university a duty to give a new position to a faculty member whose position has been abolished.

9. The plaintiffs have not suggested that the Council on Higher Education, because it authorized the termination of the pilot program, was not a disinterested tribunal. If they had wished to make that point, they could have done so before the Council and, if that point had merit and did not prevail, the point could have been preserved for adjudication by a reviewing court. *Bignall v. North Idaho College, supra,* 249.

*Superior Court*, 92 P.R.R. 462, 471–473 (1965). See *Gonzalez Saldana v. Superior Court*, 96 P.R.R. 119 (1968); *Rivera v. Chancellor of the University of Puerto Rico*, 73 P.R.R. 361 (1952); *Nunez v. Chancellor*, 65 P.R.R. 812 (1946).

That procedure fully satisfied the *procedural* requirements of the due process clause. *Bignall v. North Idaho College; Johnson v. Board of Regents, supra; Needleman v. Bohlen*, 602 F.2d 1, 5 (1st Cir. 1979). Indeed, the plaintiffs have not pointed to any alleged shortcoming of the procedure other than its failure to comply with 18 LPRA § 613(c).

It seems that the plaintiffs also contend that they were deprived of their property without *substantive* due process of law.

Perhaps the plaintiffs mean merely that they were deprived by the university of substantive due process because it did not follow its own regulations and 18 LPRA § 613(c). Violations of a university's own *procedural* regulations have been held, on the ground that they were violations of the university's own contracts, to be a deprivation of *substantive* due process. *Brenna v. Southern Colorado State College*, 589 F.2d 475, 477 (10th Cir. 1978); *Bignall v. North Idaho College, supra*, 248–249. We are not required to express agreement or disagreement with that doctrine of substantive due process inasmuch as here the university did not violate its own regulations or any Puerto Rican statute impliedly included in the contract.

■ However, it may be that the plaintiffs are contending that they were deprived of substantive due process on one or more of the following grounds: that if the contract implied that the university had a right of *bona fide* unavoidable termination of the plaintiff's employment on account of change of academic program, then (1) the university in the instant case has not borne the burden of showing that its termination was "unavoidable" (*cf. Bignall v. North Idaho College, supra*, 249), or (2) the contract includes an implied obligation that the university shall not make the termination of a tenured faculty member's employment effective (a) until a reasonable time after the university informs him of his impending dismissal and (b) until the university has for a reasonable time exercised its best efforts to place him in another suitable position equivalent to the one eliminated. We emphatically state that we express no opinion on the merits of those possible contentions; they raise questions of state contractual law, and, in addition, at least the first and perhaps all of those contentions raise a problem as to exhaustion of available state administrative remedies. *Cf. Bignall v. North Idaho College*, 246. We are not here exercising pendent or other jurisdiction over a purely local cause of action. We decide only such state contractual questions as are necessary to determine whether the plaintiffs have been deprived of their *procedural* rights of due process under the United States Constitution. If the university by terminating the plaintiffs' contracts failed to accord them only their substantive *contractual* rights, we are not concerned. A mere breach of contractual right is not a deprivation of property without *constitutional* due process of law. *Bishop v. Wood*, 426 U.S. 341, 349–350, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1976). Otherwise, virtually every controversy involving an alleged breach of contract by a government or a governmental institution or agency or instrumentality would be a constitutional case.[10]

■ There being no proof that the university's dismissal of the plaintiffs involved a stigma or reflection on their reputation, they were not deprived of their "liberty" in

---

10. If the plaintiffs mean to contend that it is economically "arbitrary," and thus a denial of substantive due process, for a *public* institution of higher education to terminate the employment of a faultless tenured faculty member without offering him equivalent employment, that is a bootless contention. The era of *Loch-* *ner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), has long since ended. *Lincoln Federal Labor Union v. Northwestern Iron and Metal Co.*, 335 U.S. 525, 535, 69 S.Ct. 251, 256, 93 L.Ed. 212 (1949); Laurence H. Tribe, *American Constitutional Law* (1978), pp. 434–455.

violation of the due process clause. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405; *Beitzell v. Jeffrey*, 643 F.2d 870, (1st Cir. 1981); *Zimmer v. Spencer*, 485 F.2d 176, 179 (5th Cir. 1973).

Inasmuch as on the undisputed facts the plaintiffs did not have a valid cause of action based on the alleged deprivation by the defendants of their due process rights, it is a moot question whether the trial judge erred in accepting *verbatim* the defendants' proposed findings. Likewise, it is a moot question whether the trial judge erred in considering without a jury the plaintiffs' equitable claim before a jury could find the facts in connection with the plaintiffs' legal claim.

*Affirmed.*